### HAGOOD & Others *v.* SOUTHERN & Another.

### HAGOOD & Others *v.* WILLIAMS.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF SOUTH CAROLINA.

Argued January 12, 13, 1886.—Decided March 1, 1886.

State scrip which declares on its face that it is receivable "in payment of all taxes and dues to the State" gives the holder no right to maintain a suit

to compel its receipt for taxes, unless he owes the taxes for which it is receivable.

*Marye* v. *Parsons*, 114 U. S. 325, and *Williams* v. *Hagood*, 98 U. S. 72, affirmed.

When a suit is brought in a court of the United States against officers of a State to enforce performance of a contract made by the State, and the controversy is as to the validity and obligation of the contract, and the only remedy sought is the performance of the contract by the State, and the nominal defendants have no personal interest in the subject matter of the suit, but defend only as representing the State, the State is the real party against whom the relief is sought, and the suit is substantially within the prohibition of the XIth Amendment to the Constitution of the United, States.

*Louisiana* v. *Jumel*, 107 U. S. 711, affirmed and applied.

The jurisdictional distinction pointed out between cases in which the relief sought is the performance of a plain official duty requiring no exercise of discretion, or where State officers under color of a State authority which is unconstitutional have invaded and violated personal and property rights, and cases like the present in which the relief sought is affirmative official action by State officers in performing an obligation which attaches to the State in its political capacity.

These two cases were heard together in the Circuit Court upon the same testimony, and the same decree passed in each. The facts, common to both, were as follows:

By an act of the General Assembly of South Carolina, passed September 15, 1868, entitled "An act to authorize additional aid to the Blue Ridge Railroad Company in South Carolina," the State, by a guaranty indorsed thereon, pledged its faith and funds to the payment of the principal and interest of bonds to be issued by the railroad company, to the amount of $4,000,000. The bonds authorized by the act, with the guaranty indorsed, were in fact issued.

On March 2, 1872, an act of the General Assembly of South Carolina was passed, entitled "An act to relieve the State of South Carolina of all liability for its guaranty of the bonds of the Blue Ridge Railroad Company by providing for the securing and destruction of the same."

The preamble to this act recited the issue of the bonds, the fact of the guaranty indorsed, the liability of the State on account thereof, and the desire of the State to withdraw them and thus relieve itself. It then proceeded to require that all

such bonds then held by the financial agent of the State, as security for advances of money made to the railroad company by the State, should be delivered up and cancelled, releasing the railroad company from all liability on account of such advances.

It then provided, that, upon the surrender by the company to the State of the balance of the issue of $4,000,000 of said bonds, issued and guaranteed as aforesaid, the State treasurer should issue in lieu thereof, to the amount of $1,800,000, certificates of indebtedness, styled revenue bond scrip, expressing that the sum mentioned therein was due by the State of South Carolina to bearer, and that the same would be received in payment of taxes and all other dues to the State, except special tax levied to pay interest on the public debt. The act also provided as follows:

" SEC. 4. That the faith and funds of the State are hereby pledged for the ultimate redemption of said revenue bond scrip, and the county treasurers are hereby required to receive the same in payment of all taxes levied by the State, except in payment of special tax levied to pay interest on the public debt, and the State treasurer and all other public officers are hereby required to receive the same in payment of all dues to the State; and still further to provide for the redemption of said revenue bond scrip, an annual tax of three mills on the dollar, in addition to all other taxes, on the assessed value of all taxable property in the State, is hereby levied, to be collected in the same manner and at the same time as may be provided by law for the levy and collection of the regular annual taxes of the State; and the State treasurer is hereby required to retire, at the end of each year from their date, one-fourth of the amount of the treasury scrip hereby authorized to be issued, until all of it shall be retired, and to apply to such purpose exclusively the taxes hereby required to be levied.

" SEC. 5. That if any such revenue bond scrip is received in the treasury for the payment of taxes, the treasurer be, and he is hereby, authorized to pay out such revenue bond scrip in satisfaction of any claim against the treasury, except for interest that may be due on the public debt."

The exchange contemplated by this act was effected ; private individuals holding the guaranteed bonds as collateral security for loans of money to the railroad company surrendered them, and accepted, in lieu thereof, revenue bond scrip at the lower rate. In this way, Amos D. Williams, the appellee in one of these causes, became and remained the holder of $165,000 of revenue bond scrip, for which he surrendered $417,000 of guaranteed bonds; and Edward B. Wesley became the holder of $1,005,000 of revenue bond scrip, for which he advanced in cash $344,925, with which were redeemed $2,902,000 of guaranteed bonds, also surrendered to the State. Wesley became, by leave of court, a party complainant with Williams in his bill, before final decree. Subject to the lien of Wesley for the payment of his cash advance as above stated, the assignees in bankruptcy of the Blue Ridge Railroad Company, who were appellees in the other cause, claimed to own the revenue bond scrip held by Wesley as collateral security for his advance. Other bonds of said railroad company guaranteed by the State, by like exchanges, were surrendered by other holders, who received and held corresponding amounts of said revenue bond scrip, and who came in, under the bill of Williams, which was filed on behalf of himself and all others in like interest choosing to do so, and proved their claims before a master, so that the whole issue of $4,000,000 of said bonds, except about $4,000 thereof, were shown to have been surrendered to the State and cancelled, on the faith of said revenue bond scrip.

After the consummation of these transactions, the Legislature of the State of South Carolina, by an act passed March 13, 1872, abolished the office of State auditor, and vested his powers in the comptroller-general ; and, by an act approved October 22, 1873, repealed the fourth section of the act of March 2, 1872, providing for an annual tax of three mills on the dollar for the redemption of the revenue bond scrip, and also forbad the comptroller to levy any tax for any purpose whatever, unless expressly thereafter authorized to do so by statute.

On December 22, 1873, it also passed an act forbidding any State or county officer to accept payment of taxes in revenue bond scrip.

. In a similar case between the same parties, in which the complainant's bill was dismissed without prejudice, and reported as *Williams* v. *Hagood*, 98 U. S. 72, it was said by this court:

"This legislation was manifestly inconsistent with the undertaking of the State expressed in the act of March 2, 1872, and in the revenue bond scrip issued thereunder, and its constitutionality and obligatory force would be a legitimate subject for consideration if the complainant had placed himself in a position to invoke our judgment. But he has not. His bill does not aver that he has been injured, or will be injured, by this legislation, or by any act or neglect of the comptroller-general or the county treasurer. It does not aver that the comptroller-general has neglected or refused to perform every duty imposed upon him by the statute under which the revenue bond scrip was issued, nor even that he threatens such neglect or refusal. It does not aver that the county treasurer has refused, or even threatened to refuse, receiving the complainant's scrip, or any scrip, in payment of taxes or dues to the State, other than taxes levied to pay the interest on the State debt. It does not aver any demand from the State treasury or any tender to the county treasurer. Its object is plainly to obtain from this court a declaration that the legislative acts of October 22d and December 22d, 1873, are unconstitutional, because impairing the obligation of the contract made by the act of 1872, and the certificates thereby authorized and thereunder issued, and this without any averment that the complainant will be injured by them. The question presented to the court is, therefore, merely an abstract one; such a one as no court can be called upon to decide, and the bill shows no equity in the complainant. Hence it was properly dismissed in the court below, and it must be dismissed here, but without prejudice to the complainant's right to bring and prosecute another suit, when he shall be in a condition to exhibit any equity in himself."

. To supply the omissions of his former bill, it was alleged by the complainant in the present one, that, in April, 1879, he tendered the said certificates of indebtedness, amounting to about $166,000, to the treasurer of the State of South Carolina and demanded payment thereof, which was refused; and that

thereupon, having advised the defendant Hagood, the comp-troller-general of the State, of this refusal of payment by the State treasurer, he requested the comptroller-general, "from time to time, to prepare and transmit to the several county audi-tors all such forms and instructions as he might deem neces-sary for collection, in the same manner and at the same time as had been provided by law for the levy and collection of the regular annual taxes of the State for the current fiscal year, the taxes provided to be levied by the 4th section of the aforesaid act of the General Assembly for the redemption of said scrip, which class of duties, your orator avers, were duties imposed upon the comptroller-general by the said act of March 2d, 1872;" but that the said comptroller-general neglected and refused to comply with said request.

It was also alleged in the bill that the revenue bond scrip, prior to the passage of the acts of the Legislature complained of had a market value equal to seventy per cent. of its face value, according to which the complainant could dispose of the same to parties desiring to use the same in payment of taxes levied by the State of South Carolina, and that the complainant lately disposed of a quantity of said scrip, on a conditional sale, that it could be so used in payment of taxes; but that the county treasurers of the different counties of the State, among others of the counties of Charleston, Oconee, Anderson and Richland, refused, and continued to refuse, to receive the said revenue bond scrip in payment of taxes; and that thereby the said rev-enue bond scrip had ceased to have any market value.

It was not averred, however, in the bill that either of the complainants, Williams or Wesley, had ever tendered revenue bond scrip in payment of taxes due from either of them; but in the bill filed by Southern and Low, as assignees in bankruptcy of the Blue Ridge Railroad Company, an averment of that character was made.

In that bill it was alleged that the Blue Ridge Railroad Com-pany was indebted to the State of South Carolina for taxes on its property for the year 1872 in the sum of $10,845.33, none of said taxes being special taxes levied to pay the interest on the public debt, of which $7541.22 was payable to the treasurer of

Oconee County, and $3,304.11 to the treasurer of Anderson County, to each of whom tenders had been duly made of said revenue bond scrip by said railroad company in payment of said taxes, but the same were refused.

The prayer of the bill in the case of Williams was, "that the act of the Legislature of the State of South Carolina of the 2d March, 1872, may be decreed a contract binding the State of South Carolina and affecting the said State with an obligation to do and perform, or cause to be done and performed, the several matters and things therein stipulated and set forth to be done and performed by the said State, through its officers and agents, particularly so much of the said act as provides for the levy of a tax to retire the said certificates of indebtedness, and to receive the same in payment of taxes and other dues to the State, except the tax levied to pay interest on the public debt; that the several parties holding, or claiming to hold, the said treasury certificates of indebtedness, bona fide and for value, may be called in and admitted to prove the same before a proper person to be appointed for that purpose; that the whole amount of such treasury certificates of indebtedness may be ascertained; that the repeal of the provisions of the said act of the 2d March, 1872, by the Legislature may be declared unconstitutional, null and void, because such repeal impairs the obligation of the contract between the State of South Carolina and your orator, and all other parties who are bona fide holders of such treasury certificates of indebtedness; that for the purpose of defending itself in such manner as it may be advised to be proper, the State may be allowed, upon the application of its attorney-general in its behalf, to be made a party to these proceedings; that, upon the ascertainment of the amount of the treasury certificates of indebtedness, proper process may be decreed against the State treasurer to perform the duties enjoined upon him by the 4th section of the act of March 2d, 1872, that is to say, to redeem the aforesaid treasury certificates of indebtedness, otherwise called revenue bond scrip, tendered by your orator to the said State treasurer, and that he may be required to receive the same in payment of all dues to the State, except interest on the public debt, and that

proper process may be issued against the comptroller-general, requiring him to perform the duties enjoined upon him under and pursuant to the different sections of said act of March 2d, 1872, and for that purpose that he from time to time be decreed to prepare and transmit to the several county auditors all such forms and instructions as may be proper and lawful for levying and collecting, or either, in the same manner and at the same time, as has been provided by law for the levy and collection of the regular annual taxes of the State for the current fiscal year, the taxes levied by the 4th section of the aforesaid act of the General Assembly for the redemption of said scrip; that the county treasurers of the said State be required to receive such treasury certificates of indebtedness as may be established as a claim under the contract created by the said act, in tender of taxes and dues to the State, except interest on the public debt; that in cases where such tender is made, the county treasurer refusing to receive the same shall be prevented by injunction from selling property or otherwise enforcing the payment of the said tax; that a mandatory injunction may be issued out of this honorable court, requiring the comptroller-general to cease from refusing to levy the tax for retiring the said treasury certificates of indebtedness, and the county treasurers to cease from refusing to receive the same for taxes and dues to the State, except to pay the interest on the public debt, and for such other and further relief as to your honors shall seem meet," &c.

The relief prayed for in the bill of the assignees of the Blue Ridge Railroad Company included also a prayer "that the defendants, the county treasurers, may be decreed to receive the said revenue bond scrip in payment of the said taxes due by your orators to the State of South Carolina; that on their refusal to do so they may be enjoined from enforcing the said taxes by selling the property of your orators, or in any other manner; and that on such refusal the lien of said taxes on the property of your orators may be declared to be discharged."

The revenue bond scrip was of different denominations, varying from $1 to $5000, and was in the form following:

"100.00.　　　　　　　　No. 91.　　　　　　　　$100.00.

"*Revenue Bond Scrip.*

"THE STATE OF [Palmetto Tree] SOUTH CAROLINA.

"COLUMBIA, S. C., *March* —, 1872.

"Receivable as one hundred dollars in payment of all taxes and dues to the State, except special tax levied to pay interest on public debt.

"NILES G. PARKER, *State Treasurer.*

"One hundred dollars.　　　　　One hundred dollars.

[On each side of scrip :] One hundred dollars, act March, 1872."

In the case of *The State ex rel. &c.* v. *Hoge, Comptroller-General,* 4 S. C. 185, the Supreme Court of that State decided, April 18, 1873, that the certificates of revenue bond scrip issued under the act of March 2, 1872, were void, as being bills of credit within the prohibition of the Constitution of the United States, the design and intention to create by means of them a circulating medium and currency being inferred from the whole scope of the act, and the form and circumstances of the emission.

Decrees were entered in the two causes, which, after reciting the findings of fact and conclusions of law reached by the Circuit Court, proceeded as follows :

"It is therefore ordered—

"I. That it be referred to James E. Hagood, Esq., clerk of this court, as special master, to take proof of the claims of all parties other than the said Amos D. Williams and Edward B. Wesley (whose claims are hereby adjudged as established), holding, or claiming to hold, any of said revenue bond scrip, *bona fide,* and for value, who may, on contributing *pro rata* to the expense of such reference and this action, prove their claims. And that said special master do ascertain and report the total outstanding amount of such treasury certificates of indebtedness.

"II. That for the purpose of defending itself the State of South Carolina may, at its option, and in such manner as it may be advised to be proper, be allowed, upon the application

of the attorney-general of said State on its behalf, to be made a party to these proceedings.

"III. That upon the ascertainment of the amount of said treasury certificates of indebtedness outstanding, proper process do issue out of and under the seal of this court against the State treasurer of the State of South Carolina for the time being, and his successors in office, compelling and requiring him and them to perform the duties enjoined upon the incumbent of that office by the fourth section of the act of 2d March, 1872, to wit, to redeem the said treasury certificates of indebtedness, and compelling and requiring him and them to receive the same in payment of all taxes and other dues to the State, except the special tax levied to pay interest on the public debt; that proper process do issue out of and under the seal of this court against the comptroller-general of the State of South Carolina for the time being, and his successors in office, compelling and requiring him and them to perform the duties enjoined upon that officer by the different sections of the act of 2d March, 1872, and compelling and requiring him from time to time to prepare and transmit to the several county auditors all such forms and instructions as may be proper and lawful for levying and collecting, in the same manner as the annual taxes, the taxes required by the fourth section of the act of 2d March, 1872; and that proper process do issue out of and under the seal of this court compelling and requiring the different county treasurers of the State of South Carolina for the time being, and their successors in office, to receive such treasury certificates of indebtedness in payment of all taxes due to the State of South Carolina, except the special tax levied to pay interest on the public debt. And in all cases where a tender of said treasury certificates of indebtedness is made, and the same refused, an injunction may issue restraining the county treasurer so refusing from selling property, or in any manner enforcing payment of said taxes.

"IV. Any party to these suits may apply at the foot of this decree for further orders in the premises."

From those decrees the appeals were prosecuted, and the two causes were argued as one.

*Mr. Charles Richardson Miles*, Attorney-General of South Carolina, and *Mr. Le Roy F. Youmans* for appellants.

*Mr. Dennis McMahon* for appellees (*Mr. Thomas S. Cavender* and *Mr. James H. Rion* were with him on the brief). The distinction in *Marye* v. *Parsons*, 114 U. S. 325, as to relief to be given to persons who are tax-payers, and those who are not tax-payers is contrary to the provision in sec. 2, Art. IV. of the Constitution, "that the citizens of each State shall be entitled to all privileges and immunities of citizens in the several States." The true ground for the decisions in that case, and in *Williams* v. *Hagood*, 98 U. S. 72, is, that neither had put himself, by previous demands or tenders, in a position to ask a judicial determination of his rights in the court. The statute of South Carolina of March 2, 1872, when executed by the surrender of the guaranteed bonds, created a contract between the State and the holders of the certificates. See *Antoni* v. *Greenhow*, 107 U. S. 769; *Poindexter* v. *Greenhow*, 114 U. S. 270; *Williams* v. *Louisiana*, 103 U. S. 637. The Federal courts have jurisdiction to enforce rights under this contract. The laws of the State impose upon the State officers who are parties duties connected with the levying and collection of taxes, which can be enforced by a citizen of South Carolina in the courts of that State by remedies analogous to those sought in these bills. *D'Oyley's Case*, 1 Brevard, 238; *Watson* v. *Mayrant*, 1 Rich. S. C. Eq. 449; *Singleton* v. *Commissioners*, 2 Bay, 105.

The remedies asked for are proper to be granted. See observations of this court in *Allen* v. *Baltimore & Ohio Railroad Co.*, 114 U. S. 311, 315, 316. See *Transportation Co.* v. *Parkersburgh*, 107 U. S. 691, 695; *Tomlinson* v. *Branch*, 15 Wall. 460; *Cummings* v. *National Bank*, 101 U. S. 153, 157; *Memphis Railroad Co.* v. *Commissioners*, 112 U. S. 609; *Osborn* v. *Bank of the United States*, 9 Wheat. 738; *Clark* v. *Barnard*, 108 U. S. 436; *Cunningham* v. *Macon & Brunswick Railroad Co.*, 109 U. S. 446; *Board of Liquidation* v. *McComb*, 92 U. S. 531, 541; *Davis* v. *Gray*, 16 Wall. 203, 220. See also *Murray* v. *Charleston*, 96 U. S. 432; *Edwards* v. *Kearzey*, 96

U. S. 595; *Tennessee* v. *Sneed*, 96 ·U. S. 69; *Allen* v. *Balti-more & Ohio Railroad Co.*, 114 U. S. 311, 315, 316; *Trans-portation Co.* v. *Parkersburgh*, 107 U. S. 691, 695; *Tomlinson* v. *Branch*, 15 Wall. 460; remarks in *Poindexter* v. *Greenhow,* 114 U. S. at page 295 on equitable remedies; *Cummings* v. *National Bank*, 101 U. S. 153, 157. If the court reaches the conclusion that all the relief given below should not be awarded, it may modify the decrees. But the fact that the granting the relief in question, so far as it orders the State officers of South Carolina to levy the tax specified and provided for in the act of March 4, 1872, constituting the contract in question, trenches upon the political power of the State of South Carolina, ought not to be an objection to affirming the decree in question: See *United States* v. *Peters*, 5 Cranch, 115—a most remarkable case; *Martin* v. *Hunter*, 1 Wheat. 304; *McCulloch* v. *State of Maryland*, 4 Wheat. 316; *Cohens* v. *Virginia*, 6 Wheat. 264; *Osborn* v. *Bank of the United States*, 9 Wheat. 738. See ob-servations of Field, J., in *Louisiana* v. *Jumel*, 107 U. S. 733, in his dissenting opinion.

These certificates were not issued in violation of the Consti-tution of the United States; nor were they issued in violation of the provisions of the Constitution of South Carolina—*Mr. McMahon* also argued at length other points not passed upon in the opinion of the court.

MR. JUSTICE MATTHEWS delivered the opinion of the court. After stating the case as above reported, he continued:

No specific provision is made in these decrees for the redemp-tion of the revenue bond scrip in which the assignees of the Blue Ridge Railroad Company claim an interest, nor any direction to the treasurers of the counties in which its taxes are due to receive the scrip in payment therefor from the com-pany; but the command of the decrees is broad enough to include such relief in their favor. But it is difficult to conceive on what theory of the relation between the railroad company and the State it can be maintained. The revenue bond scrip was issued by the State in exchange for the bonds of the rail-road company guaranteed by the State, and in order that by

their surrender and cancellation the State might be relieved
from its liability on that account. The State was surety for
the railroad company and not debtor to it, and was not liable
to it, either upon the guaranty or the certificates of indebted-
ness issued in lieu thereof. Neither was available as a demand
against the State except in the hands of a holder for value,
and neither constituted a contract until value had thus passed,
as a consideration for the promises of the State. The railroad
company is certainly not such a holder, and its assignees in
bankruptcy are in no better position. As between the railroad
company and the State, the former is primarily liable for any
debt represented by the revenue bond scrip, or for which it is
held by others as security, and is bound to indemnify the State
against loss on account of its suretyship. To authorize the
railroad company to pay its taxes in these certificates, is sim-
ply to exonerate it from taxation, and to compel payment of
them to it, is to reverse the order of the obligation, by com-
pelling the surety not only to become principal debtor to
strangers, but to convert its debtor into a creditor.

No other parties to these suits, including those who have
merely proved their claims before the master under the order
of reference, have made any tender of revenue bond scrip in
payment of specific taxes due from them; and, so far as the con-
tract is that such payment may be made, no breach is shown.
The discredit cast upon the scrip by the general refusal to ac-
cept it by the tax collectors of the State, and the depreciation
in value occasioned thereby, are not actionable injuries. In
this aspect, the case falls precisely within that of *Marye* v.
*Parsons*, 114 U. S. 325, and does not materially differ from
the case as made on the previous bill of Williams, and decided
in *Williams* v. *Hagood*, 98 U. S. 72. So far as the instrument
contains a promise that it will be received in payment of taxes,
it is a contract with the holder for the time being, who has
taxes to pay; and although such a stipulation, faithfully exe-
cuted, would give commercial value to the paper, in whosesoever
hands it may happen to be, it cannot be said, as a matter of
law, that the contract is broken, until it has been tendered for
taxes due from a holder and been refused, nor that the legal

right of the holder is threatened, unless he is in a situation to make a present tender for that purpose. He has no legal right to have this scrip received for taxes, unless he owes taxes for which it is receivable; and in order that it may be used for the payment of the taxes of another, he must transfer it to the new holder, and that would divest himself of all right to enforce a contract to which he is no longer a party and in which he has ceased to have a legal interest.

But it is urged, with earnestness and zeal, that the complainants, Williams and Wesley, are entitled to so much of the relief prayed for as in effect would operate to compel the comptroller-general of the State to execute in their favor the provisions of the act of March 2, 1872, relating to the levy, collection, and application of the tax pledged by the fourth section of that act to the redemption of the revenue bond scrip. The ground on which that relief is based, of course, is, that the act of March 2, 1872, must still be regarded as subsisting, notwithstanding the subsequent formal repeal by the Legislature; which must be treated as null and void, because it impairs and destroys the obligation of the contract between the holders of these certificates of indebtedness and the State of South Carolina. Treating the repealing acts, then, as of no force, the inference is drawn that the duty of the officers of the State remains, as declared and defined by the act of March 2, 1872, and its performance may be enforced by judicial process in behalf of every one having a legal interest in the subject.

It is to be borne in mind, however, that the State of South Carolina denies the existence and validity of the alleged contract. It asserts that the revenue bond scrip was issued in violation of the Constitution of the State, which provides, Art. IX., sec. 7, that public debts may be contracted for the purpose of defraying extraordinary expenditures; sec. 10, that no scrip, certificate, or other evidence of State indebtedness, shall be issued, except for the redemption of stock, bonds, or other evidences of indebtedness previously issued; and sec. 14, that any debt contracted by the State shall be by loan on State bonds, of amounts not less than $50 each, on interest, payable

within twenty years after the final passage of the law authorizing such debts. It asserts that the guaranty by the State of the original bonds of the Blue Ridge Railroad Company was illegal and void, because made in violation of express statutory conditions, which, it alleges, were never repealed, as was claimed by the holders of them; and that, consequently, the revenue bond scrip was without consideration, which, appearing on the face of the law itself, deprived the certificates of all validity in whatever hands they might be found. It further asserts, that the revenue bond scrip in question is void, as being in violation of that provision of the Constitution of the United States, Art. I., sec. 10, which declares that no State shall emit bills of credit, contending that these certificates, on the face of the instrument and of the law creating it, appear manifestly designed to circulate as money in the ordinary transactions of business.

It thus appears that a distinct issue is made by the State of South Carolina with the holders of this revenue bond scrip, and the controversy between them and the State involves the very question of the existence and obligation of the alleged contract. This controversy the State has undertaken to settle for itself. By its legislative department, it has repealed the statutes authorizing its officers to execute the contract on its behalf, and forbidden the levy, collection, and appropriation of taxes for the payment of the scrip. Through its judicial department it has declared as between itself and its officers, that the instruments themselves are unconstitutional and void, and without obligation. To this judgment, however, no holder of the scrip was a party, and, of course, it concludes no one.

The peculiarity of the alleged contract deserves to be noted. The instrument, looked at as the sole evidence of the obligation, contains no promise whatever to pay money. It declares simply that it is receivable for the amount of money named, in payment of taxes and dues to the State, except special tax to pay interest on public debt. If it be read as containing the law which authorized its issue, it is a contract that it shall be redeemed, one-fourth of the whole amount each year, out of taxes specially to be levied for that purpose. Although

styled in the law "certificates of indebtedness," there is no agreement generally to pay a named sum at a given time, in the usual form of public securities for the payment of money, nor even an express acknowledgment of an existing debt.

The controversy in which the validity and obligation of the scrip are involved is the subject of the present suits. The complainants as holders of this scrip, in behalf of themselves and of all other holders choosing to take part, are seeking to obtain by judicial process its redemption by the State, according to the terms of the statute in pursuance of which it was issued, by the levy, collection, and appropriation of special taxes pledged to that purpose, as they claim, by an irrepealable law, constituting a contract protected from violation by the Constitution of the United States. And such are the decrees which have been rendered according to the prayer of the bills. These suits are accurately described as bills for the specific performance of a contract between the complainants and the State of South Carolina, who are the only parties to it. But to these bills the State is not in name made a party defendant, though leave is given to it to become such, if it chooses; and, except with that consent, it could not be brought before the court and be made to appear and defend. And yet it is the actual party to the alleged contract the performance of which is decreed, the one required to perform the decree, and the only party by whom it can be performed. Though not nominally a party to the record, it is the real and only party in interest, the nominal defendants being the officers and agents of the State, having no personal interest in the subject-matter of the suit, and defending only as representing the State. And the things required by the decrees to be done and performed by them are the very things which, when done and performed, constitute a performance of the alleged contract by the State. The State is not only the real party to the controversy, but the real party against which relief is sought by the suit, and the suit is, therefore, substantially within the prohibition of the XIth amendment to the Constitution of the United States, which declares that "the judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against

one of the United States by citizens of another State, or by citizens or subjects of any foreign State."

The case comes thus directly within the authority of *Louisiana* v. *Jumel*, 107 U. S. 711. It was there said: "The question, then, is whether the contract can be enforced, notwithstanding the Constitution, by coercing the agents and officers of the State, whose authority has been withdrawn in violation of the contract, without the State itself in its political capacity being a party to the proceedings. The relief asked will require the officers against whom the process is issued to act contrary to the positive orders of the supreme political power of the State, whose creatures they are, and to which they are ultimately responsible in law for what they do. They must use the public money in the treasury and under their official control in one way, when the supreme power has directed them to use it in another, and they must raise more money by taxation when the same power has declared that it shall not be done." p. 721. And: "The remedy sought, in order to be complete, would require the court to assume all the executive authority of the State, so far as it related to the enforcement of this law, and to supervise the conduct of all persons charged with any official duty in respect to the levy, collection and disbursement of the tax in question, until the bonds, principal and interest, were paid in full, and that, too, in a proceeding in which the State, as a State, was not and could not be made a party. It needs no argument to show that the political power cannot be thus ousted of its jurisdiction and the judiciary set in its place. When a State submits itself without reservation to the jurisdiction of a court in a particular case, that jurisdiction may be used to give full effect to what the State has by its act of submission allowed to be done; and if the law permits coercion of the public officers to enforce any judgment that may be rendered, then such coercion may be employed for that purpose. But this is very far from authorizing the courts, when a State cannot be sued, to set up its jurisdiction over the officers in charge of the public moneys, so as to control them as against the political power, in their administration of the finances of the State." p. 727.

If this case is not within the class of those forbidden by the constitutional guaranty to the States of immunity from suits in Federal tribunals, it is difficult to conceive the frame of one which would be. If the State is named as a defendant, it can only be reached either by mesne or final process through its officers and agents, and a judgment against it could neither be obtained nor enforced, except as the public conduct and government of the ideal political body called a State could be reached and affected through its official representatives. A judgment against these latter, in their official and representative capacity, commanding them to perform official functions on behalf of the State according to the dictates and decrees of the court, is, if anything can be, a judicial proceeding against the State itself. If not, it may well be asked, what would constitute such a proceeding ?

In the present cases the decrees were not only against the defendants in their official capacity, but, that there might be no mistake as to the nature and extent of the duty to be performed, also against their successors in office.

The principle which governs in these cases must be carefully distinguished from that which ruled in *Osborn* v. *Bank of the United States,* 9 Wheat. 738; *Davis* v. *Gray,* 16 Wall. 203; *Board of Liquidation* v. *McComb,* 92 U. S. 531; and *Allen* v. *Baltimore & Ohio Railroad Co.,* 114 U. S. 311;—a distinction which was pointed out in *Louisiana* v. *Jumel, ubi supra,* and in *Cunningham* v. *Macon & Brunswick Railroad Co.,* 109 U. S. 446. The rule for such cases was well stated by Mr. Justice Bradley in *Board of Liquidation* v. *McComb, ubi supra,* as follows: " A State, without its consent, cannot be sued by an individual; and a court cannot substitute its own discretion for that of executive officers in matters belonging to the proper jurisdiction of the latter. But it has been well settled, that when a plain official duty, requiring no exercise of discretion, is to be performed, and performance is refused, any person who will sustain personal injury by such refusal may have a *mandamus* to compel its performance; and when such duty is threatened to be violated by some positive official act, any person who will sustain personal injury thereby, for which adequate

compensation cannot be had at law, may have an injunction to prevent it." p. 541. And on the other hand, the rule for that class of cases was stated by the Chief Justice in *Louisiana* v. *Jumel, ubi supra*, in these words: "The officers owe duty to the State alone, and have no contract relations with the bondholders. They can only act as the State directs them to act, and hold as the State allows them to hold. It was never agreed that their relations with the bondholders should be any other than as officers of the State, or that they should have any control over this fund except to keep it like other funds in the treasury and pay it out according to law. They can be moved through the State, but not the State through them." p. 723. In such cases, as was said by Chief Justice Marshall in *Osborn* v. *Bank of the United States*, 9 Wheat. 738, 858, "The State not being a party on the record, and the court having jurisdiction over those who are parties on the record, the true question is not one of jurisdiction, but whether, in the exercise of its jurisdiction, the court ought to make a decree against the defendants; whether they are to be considered as having a real interest, or as being only nominal parties."

A broad line of demarcation separates from such cases as the present, in which the decrees require, by affirmative official action on the part of the defendants, the performance of an obligation which belongs to the State in its political capacity, those in which actions at law or suits in equity are maintained against defendants who, while claiming to act as officers of the State, violate and invade the personal and property rights of the plaintiffs, under color of authority, unconstitutional and void. Of such actions at law for redress of the wrong, it was said by Mr. Justice Miller, in *Cunningham* v. *Macon & Brunswick Railroad Co., ubi sup.*: "In these cases he is not sued as or because he is the officer of the government, but as an individual, and the court is not ousted of jurisdiction because he *asserts* authority as such officer. To make out his defence he must show that his authority was sufficient in law to protect him." p. 452. Of such cases that of *United States* v. *Lee*, 106 U. S. 196, is a conspicuous example, and it was upon this ground that the judgment in *Poindexter* v. *Greenhow*, 114 U. S. 270, was rested.

And so the preventive remedies of equity, by injunction, may be employed in similar cases to anticipate and prevent the threatened wrong, where the injury would be irreparable, and there is no plain and adequate remedy at law, as was the case in *Allen* v. *Baltimore & Ohio Railroad Co.*, 114. U. S. 311, where many such instances are cited.

The defendants in the present cases, though officers of the State, are not authorized to enter its appearance to the suits and defend for it in its name. The complainants are not entitled to compel its appearance, for the State cannot be sued without its consent. And the court cannot proceed to the determination of a cause and controversy, to which the State is an indispensable party, without its presence. This, however, the Circuit Court has in fact done; and its decrees undertake to dispose of the matter in controversy, and enforce the judgment of the court against the State through its officers, in a suit to which it is not a party. The suggestion that it has had the opportunity and the invitation to appear is immaterial, for it has a constitutional right to insist on its immunity from suit. For these reasons

*The decrees of the Circuit Court are reversed, and the causes are remanded, with instructions to dismiss the bills of complaint.*

Mr. JUSTICE FIELD and Mr. JUSTICE HARLAN, while adhering to the views expressed by them in their dissenting opinions in *Louisiana* v. *Jumel*, 107 U. S. 726, 748, admit that the doctrines of that case require a reversal of the judgment in this case.