## WESLEY v. EELLS.

(Circuit Court, N. D. Ohio, E. D. November 14, 1898.)

### No. 5,734.

1. STATES—BILLS OF CREDIT—REVENUE BOND SCRIP OF SOUTH CAROLINA.
   The revenue bond scrip of the state of South Carolina, issued to the amount of $1,800,000 under the act of March 2, 1872, is in the form of bills receivable of the state, which resemble bank or treasury notes. The act authorizes their issuance in denominations to be determined by the state treasurer and the president of the railroad to which they were issued, and denominations were made as small as $1. Under the act they bear no interest, and no date of payment is fixed; but the faith and funds of the state were pledged to their ultimate redemption, and a tax levy was provided for, to be applied to their retirement. They were made receivable at all times after their issuance for all dues and taxes to the state, except taxes levied to pay interest on the public debt; and, when so received, the state treasurer was authorized to pay them out again in

satisfaction of any claim against the treasury. *Held,* that they were intended for circulation as money, and constitute bills of credit of the state, within the prohibition of the constitution of the United States, and are therefore void.

2. SAME.

Such scrip having been issued for the purpose of taking up the bonds of a railroad upon which the state had become guarantor, the fact that the railroad company is bound to indemnify the state for any loss by reason of its suretyship does not render the scrip an obligation of the railroad company, nor change its character as bills of credit of the state alone.

This was a suit in equity by Edward B. Wesley against Howard P. Eells for the specific enforcement of a contract for the sale of property.

J. M. Shallenbarger and Wm. H. Lyles, for complainant.

A. St. John Newberry, for respondent.

RICKS, District Judge. This is an action to enforce the specific performance of an admitted contract between complainant and defendant for the sale and purchase by them, respectively, of certain property known as "Agricultural Hall," located in the city of Columbia, South Carolina. On December 24, 1890, the state of South Carolina being the owner of said Agricultural Hall property, the general assembly of that state passed an act providing for the sale of said property by the commissioners of the sinking fund of the state of South Carolina. Pursuant to that act, the property was sold at public auction on February 2, 1892, and was bid in by the complainant, by his attorney, for the sum of $16,165. By the terms of sale the purchaser was required to pay in cash one-third of the purchase price, and to execute his bond and a mortgage of the premises to secure the balance of the purchase price, in two equal annual installments, with interest from the day of sale; the obligor to have the option of paying the whole or any part of the indebtedness so to be secured at any time before its maturity. Complainant caused the deed for the premises to be made to one J. W. Alexander, who consented to act as trustee for him for the purchase of the premises; and the deed was duly executed and delivered by the commissioners of the sinking fund to Alexander, in fee simple, without a declaration of the trust. Alexander executed and delivered to the treasurer of the state of South Carolina his bond, in the penal sum of $21,553.34, conditioned for the payment of $10,776.67 in two equal annual installments from the date of the bond, with interest payable annually. It was provided in the bond that Alexander should have the privilege of paying the whole or any part of the amount secured by the bond before maturity. The bond and mortgage and deed of conveyance were dated the 2d of February, 1892,—the day of sale. On the 16th day of February, 1892, complainant, Wesley, being the owner and holder of a large amount of revenue bond scrip of the state of South Carolina, furnished to the said Alexander an amount thereof which at its par value was more than sufficient to cover the amount due the state of South Carolina on said bond and mortgage; and

Alexander, through his attorneys, exercising the power given him by the terms and conditions of his bond to the state, duly tendered to W. T. C. Bates, state treasurer of South Carolina, the full amount due thereon, including interest. Bates had the custody and possession of the bond and mortgage, and was the officer designated by law to receive the amount of the bond and mortgage; he being the obligee named in the bond. The tender was refused. By the laws of South Carolina, a tender in full of the amount of money due to a mortgagee, secured by a mortgage of personal or real property, at any time when the mortgagor has a right to pay the same, operates as a satisfaction and extinguishment of the lien of the mortgage securing the payment of such money, whether the amount so tendered be accepted or not, and whether the mortgagor shall keep himself in position to make good the tender or not. Salinas v. Ellis, 26 S. C. 337, 2 S. E. 121. After tender was made by Alexander the state treasurer caused the mortgage given by Alexander to be filed for record in the office of the register of mesne conveyances for Richland county, S. C. The mortgage still stands of record, unsatisfied. On February 15, 1893, Alexander conveyed said Agricultural Hall property to complainant, at his request. In October, 1897, complainant entered into a contract with Howard P. Eells, defendant herein, whereby he agreed to convey said Agricultural Hall property to said Eells, free from any valid lien or incumbrance whatever, at and for the price of $20,000 in cash. The premises are now, and were at the time of making the contract, of the value of $20,000. Complainant is ready and willing to deliver to defendant a good and sufficient deed, in law, to convey the said premises to him in fee simple. Defendant refuses to receive said deed and pay the purchase price; contending that the revenue bond scrip tendered by Alexander in payment of the amount due on the bond and mortgage was not a valid obligation of the state of South Carolina, and consequently did not constitute a legal tender for the debt, and did not operate as an extinguishment of the lien of the mortgage. There are no other liens upon said property, except some unentered taxes due the state of South Carolina, which amount complainant is willing that defendant retain out of the purchase price of the premises, when ascertained. It is admitted that if the revenue bond scrip tendered by Alexander was valid, and receivable for dues to the state of South Carolina, the lien of the mortgage was extinguished by its tender. But defendant claims that the revenue bond scrip was in its inception invalid and unconstitutional, constituted no claim against the state of South Carolina, and that its tender was a mere nullity.

By an act of the general assembly of South Carolina passed September 15, 1868, entitled "An act to authorize additional aid to the Blue Ridge Railroad Company in South Carolina," the state, by a guaranty indorsed thereon, pledged its faith and funds to the payment of the principal and interest of the bonds to be issued by the railroad company, to the amount of $4,000,000. The bonds authorized by the act, with the guaranty indorsed, were issued. On March 2, 1872, an act of the general assembly of South Carolina authorizing the issue

of the revenue bond scrip tendered in payment of the mortgage given by Alexander to the state of South Carolina was passed, and is as follows:

"An act to relieve the state of South Carolina óf all liability for its guaranty of the bonds of the Blue Ridge Railroad Company, by providing for the securing and destruction of the same.

"Whereas the state of South Carolina has, by and in pursuance of the provisions of an act approved the fifteenth day of September, A. D. 1868, entitled 'An act to authorize additional aid to the Blue Ridge Railroad Company, in South Carolina,' endorsed a guaranty of the faith and credit of the state on four millions of dollars of bonds, issued by the said Blue Ridge Railroad Company, comprehending the Blue Ridge Railroad Company, in South Carolina; the Blue Ridge Railroad Company, in Georgia; the Tennessee River Railroad Company, in North Carolina; the Knoxville and Charleston Railroad Company, in Tennessee, and the Pendleton Railroad Company, in South Carolina, for the purpose of aiding the speedy completion of the said railroad, which bonds are liable for the debts of the said railroad companies; and whereas the present condition of the finances of the state, and of said companies, is such as to make the further continuance of said bonds on the market inexpedient and unadvisable, and a serious injury and prejudice to the credit of the state; and whereas the existence of the said four millions of dollars of bonds, so guaranteed, creates a large liability upon the part of the state, which the treasurer may be required to meet at unforeseen and inopportune times; and whereas the liability of the state, on account of such guaranty, should be faithfully met and discharged; therefore, in order to secure the recovery and destruction of the bonds and coupons of the said company, issued under and in pursuance of the provisions of the aforesaid act, now pledged in the city of New York and elsewhere, and to relieve the state of all liabilities whatsoever, by reason of its endorsement and guaranty of said bonds:

"Section 1. Be it enacted by the senate and house of representatives of the state of South Carolina, now mêt and sitting in general assembly, and by the authority of the same, that the state treasurer is hereby directed, with the consent, in writing, of the president of the Blue Ridge Railroad Company, in South Carolina, to require the financial agent of the state, in the city of New York, immediately to deliver to the state treasurer all the bonds of the Blue Ridge Railroad Company, endorsed and guaranteed by the state of South Carolina, which are now in his possession, and held by him as collateral security, for advances made by the said financial agent, by the order of the financial board of the Blue Ridge Railroad Company; and upon the delivery of said bonds, the treasurer is hereby required to cancel the same, in the manner hereinafter directed; and the said Blue Ridge Railroad Company shall thereupon be discharged from all liability to the state on account of such advances.

"Sec. 2. That upon the surrender by the said company to the state treasury of the balance of the said four millions of dollars of bonds, issued by the said Blue Ridge Railroad Company, and guaranteed by the state, the state treasurer is hereby authorized and required to deliver to the president of the Blue Ridge Railroad Company, in South Carolina, treasury certificates of indebtedness (styled revenue bond scrip) to the amount of one million eight hundred thousand dollars, the said certificates to be executed in the manner hereinafter directed; and if the said company shall not be able to deliver all of said bonds at one time, the treasurer is authorized and required to deliver to the said president such amount of such treasury certificates as shall be proportioned to the amount of bonds delivered.

"Sec. 3. That, to carry out the purposes of this act, the state treasurer is hereby authorized and required to have printed, or engraved on steel, as soon as practicable, treasury certificates of indebtedness, to be known and designated as revenue bond scrip of the state of South Carolina, in such form, and of such denomination as may be determined on by the state treasurer and the president of the Blue Ridge Railroad Company, in South Carolina to

the amount of one million eight hundred thousand dollars; which revenue bond scrip shall be signed by the state treasurer, and shall express that the sum mentioned therein is due by the state of South Carolina to the bearer thereof, and that the same will be received in payment of taxes and all other dues to the state, except special tax levied to pay interest on the public debt.

"Sec. 4. That the faith and funds of the state are hereby pledged for the ultimate redemption of said revenue bond scrip, and the county treasurers are hereby required to receive the same in payment of all taxes levied by the state, except in payment of special tax levied to pay interest on the public debt; and the state treasurer and all other public officers are hereby required to receive the same in payment of all dues to the state; and, still further to provide for the redemption of said revenue bond scrip, an annual tax of three mills on the dollar, in addition to all other taxes, on the assessed value of all taxable property in the state, is hereby levied, to be collected in the same manner, and at the same time, as may be provided by law for the levy and collection of the regular annual taxes of the state; and the state treasurer is hereby required to retire at the end of each year from their date, one-fourth of the amount of the treasurer's scrip hereby authorized to be issued, until all of it shall be retired, and to apply to such purpose exclusively the taxes hereby required to be levied.

"Sec. 5. That if any such revenue bond scrip is received in the treasury for the payment of taxes, the treasurer be, and he is hereby, authorized to pay out such revenue bond scrip in satisfaction of any claims against the treasury, except for interest that may be due on the public debt.

"Sec. 6. That upon the delivery to the state treasurer of the said guaranteed bonds of the Blue Ridge Railroad Company, or of any part of them, the treasurer is hereby required to cause the same to be cancelled and destroyed, in the presence of the president of the Blue Ridge Railroad Company, in South Carolina, and in the presence of a joint committee of the senate and house of representatives of this state, to be for that purpose appointed.

"Sec. 7. That whenever the whole number of the said guaranteed bonds shall have been delivered to the treasurer and cancelled, as required by the provisions of this act, the lien of the state of South Carolina upon the estate, property and funds of the said Blue Ridge Railroad Company, in this state, and of the other associated companies in the states of Georgia, North Carolina and Tennessee, as secured by the provisions of an act entitled 'An act to authorize additional aid to the Blue Ridge Railroad Company, in South Carolina,' passed on the fifteenth day of September, Anno Domini one thousand eight hundred and sixty-eight, and all other claims or liens which are held by the state against said company or companies, on account of said guaranty, shall, from thence forth, be forever discharged and released; and should the said company be unable, from any cause, to deliver all of said bonds, such liens shall be discharged and released to an extent which shall be proportional to the amount of such bonds actually delivered.

"Sec. 8. That, if the said company shall accept the provisions of this act, it shall be authorized, if the board of directors may desire, to change the corporate name of the company to that of the 'Knoxville & South Carolina Railroad Company,' and shall have power to extend its railroad or to construct branches thereof, to any points or places in this state, with all the powers and privileges with which the said company is now vested by the provisions of its charter; and the said company shall also have power to issue bonds, and to secure the same by a mortgage, to such amount, and in such manner as the board of directors may direct. And all sales of stock in the said Blue Ridge Railroad Company, in South Carolina, and its associate companies, formerly held by the state and sold by the commissioners of the sinking fund, be, and they are hereby, confirmed.

"Sec. 9. That if any person shall forge or counterfeit the treasury scrip hereby authorized to be issued, or shall, directly or indirectly, aid or assist in the forging or counterfeiting of such scrip, or shall issue, or in any manner use any such, forged or counterfeited, he shall, on conviction thereof, be fined in the discretion of the court, and shall be imprisoned in the penitentiary for a term not exceeding ten years."

The revenue bond scrip issued pursuant to this act was of different denominations, varying from $1 to $5,000, and was in the form following:

"$100.00.                          No.   21.                          $100.00.
"Revenue Bond Scrip.
"The State of [palmetto tree] South Carolina.
"Columbia, S. C., March ——, 1872.
"Receivable as one hundred dollars in payment of all taxes and dues to the state, except special tax levied to pay interest on public debt.
"Niles G. Parker, State Treasurer.
"One Hundred Dollars.                          One Hundred Dollars."
On each side of scrip:  "One Hundred Dollars, Act March, 1872."

The exchange contemplated by this act was effected. Individuals holding the guarantied bonds as collateral security for loans of money to the railroad company surrendered them, and accepted in lieu thereof revenue bond scrip, at the lower rate. Complainant, Wesley, advanced the sum of $344,925 in cash, and with that sum redeemed $2,902,000 of the said Blue Ridge Railroad bonds, with all their coupons attached, and delivered the same to the treasurer of the state of South Carolina; and the said bonds and attached coupons were mutilated and canceled, in accordance with the provisions of said act. Wesley received from the state treasurer of South Carolina $1,005,-000 of the said revenue bond scrip. After the exchange of guarantied bonds for scrip was made, the legislature of South Carolina passed an act, on March 13, 1872, abolishing the office of state auditor, and vesting his powers in the comptroller general. By an act passed October 22, 1873, the fourth section of the act of March 2, 1872, providing for an annual tax of three mills on the dollar for the redemption of the revenue bond scrip, was repealed. The act also forbade the comptroller general to levy any tax whatever, unless expressly thereafter authorized to do so by statute. On December 22, 1873, an act was passed forbidding any state or county officer to accept payment of taxes in revenue bond scrip, and forbidding the collection of taxes to redeem said revenue bond scrip. The provision in the act of March 2, 1872, that the scrip should be received in payment of dues to the state, has never been repealed.

This South Carolina revenue bond scrip has twice been held to be bills of credit by the supreme court of South Carolina, in the cases of State v. Comptroller General, 4 S. C. 185, and Auditor v. Treasurer, 4 S. C. 311. To this judgment no holder of the revenue bond scrip was a party, and they are not concluded thereby. Hagood v. Southern, 117 U. S. 52, 6 Sup. Ct. 608. This scrip has also been before the supreme court of the United States three times. The decision in the first two cases was adverse to the holders of the scrip, upon the ground that the actions were suits against the state of South Carolina without its consent, and they were dismissed without prejudice to a new action. Williams v. Hagood, 98 U. S. 72; Hagood v. Southern, 117 U. S. 52, 6 Sup. Ct. 608. The holding in the other one was in favor of the complainant in this case, the decision being that he

was entitled to the possession of the property which is the subject of this suit. Tindal v. Wesley, 167 U. S. 204, 17 Sup. Ct. 770. But the question of the violation of the constitution of the United States or that of the state of South Carolina was not passed upon in either of these cases.

Defendant asserts that the revenue bond scrip of South Carolina was issued in violation of the constitution of South Carolina, which provides (article 9, § 7) that public debts may be contracted for the purpose of defraying extraordinary expenditures; (section 10) that no scrip, certificate, or other evidence of state indebtedness shall be issued, except for the redemption of stock, bonds, or other evidence of indebtedness previously issued; (and section 14) that any debt contracted by the state shall be by loan on state bonds, of amounts not less than $50 each, on interest, payable within 20 years after the final passage of the law authorizing such debts. He avers that the guaranty of the state of the original bonds of the Blue Ridge Railroad Company was illegal and void, because made in violation of express statutory conditions which were never repealed, and that as a consequence the revenue bond scrip was without consideration, which, appearing on the face of the law itself, deprived the certificates of all validity, in whosesoever hands they might be found. Defendant also contends that the revenue bond scrip is void as being in violation of the provision of the constitution of the United States (article 1, § 10) which declares that no state shall emit bills of credit, and that these certificates, on the face of the instrument and the law creating it, appear manifestly designed to circulate as money in the ordinary transactions of business. Are these certificates bills of credit, within the meaning of the United States constitution? In the case of Poindexter v. Greenhow, 114 U. S., at page 283, and 5 Sup. Ct., at page 910, the supreme court say:

"The meaning of the term 'bills of credit,' as used in the constitution, has been settled by decisions of this court. By a sound rule of interpretation, it has been construed in the light of the historical circumstances which are known to have led to the adoption of the clause prohibiting their emission by the states, and in view of the great public and private mischiefs experienced during and prior to the period of the War of Independence in consequence of unrestrained issues by the colonial and state governments of paper money based alone upon credit. The definition thus deduced was not founded on the abstract meaning of the words, so as to include everything in the nature of an obligation to pay money, reposing on the public faith, and subject to future redemption, but was limited to those particular forms of evidences of debt which had been so abused to the detriment of both private and public interests. Accordingly. Chief Justice Marshall, in Craig v. Missouri, 4 Pet. 410, 432, said that 'bills of credit signify a paper medium intended to circulate between individuals, and between government and individuals, for the ordinary purposes of society.' This definition was made more exact, by merely expressing, however, its implications, in Briscoe v. Bank, 11 Pet. 257, 314, where it was said: 'The definition, then, which does include all classes of bills of credit emitted by the colonies or states, is a paper issued by the sovereign power, containing a pledge of its faith, and designed to circulate as money.' And again (page 318): 'To constitute a bill of credit, within the constitution, it must be issued by a state, on the faith of the state, and be designed to circulate as money. It must be a paper which circulates on the credit of the state, and is so received and used in the ordinary business of life.' The definition was repeated in Darrington v. Bank, 13 How. 12.''

A paper, then, which is a bill of credit, has three essentials: (1) It must be issued by a state in its sovereign character; (2) it must contain a pledge of the faith of the state; (3) it must be designed to circulate as money. There can be no serious dispute that the first two requirements are clearly established by the act itself. Section 3 provides for a paper, to be issued by the state treasurer, and signed by him, expressing that the amount named therein is due to the bearer from the state of South Carolina. By section 4 the faith and funds of the state are pledged for its ultimate redemption. It remains to be determined whether this scrip was intended to circulate as money.

The opinion of the supreme court of South Carolina in the case of State v. Comptroller General, 4 S. C. 185, and the opinion of Judge Willard, of the supreme court of South Carolina, on circuit, in the cases of State v. Parker and Dupre v. County Treasurers, Id. 229, which cases were affirmed by the supreme court of South Carolina in Auditor v. Treasurer, Id. 311, discuss the question as to whether this scrip was intended to pass as currency or a circulating medium. These opinions make it quite clear that the legislature intended that the scrip should circulate, between the state government and the people, as money. The supreme court of South Carolina, in passing upon the validity of this scrip, speaking through Chief Justice Moses, gives its reasons for holding them to be bills of credit, as follows:

"The argument which holds it valid as a subsisting obligation, and repels the character of a bill of credit, under which it is classed by the respondent, seems to rest upon the fact that it was not designed to circulate as money. The opinion of Mr. Justice Willard in State v. Parker and Dupre v. County Treasurers, which was brought to our notice in the case before us, and which will be reported with it, is so full and comprehensive on the point as to leave little space for addition or enlargement. It is not because the paper circulates from hand to hand in a community, like money, that it is to be held a bill of credit; nor does the fact of currency so constitute it. A state might well make the coupons attached to its bonds receivable for taxes without subjecting them to the disabilities of bills of credit, as used in the constitution, even although they might readily pass in payment of debts or for the purchase of commodities. The design to create a circulating medium would be wanting. If, however, the intention to create a currency is apparent from the whole scope of the act, the emission is a bill of credit, within the terms of the constitution. To the many indications in the act to show the intended design which have been pointed out in the opinion of Justice Willard, it might be added that the revenue bond scrip could never have been intended or proposed as a state security for investment, because it bore no interest, and its value consisted in the fact of its ready capacity and facility in supplying all articles necessary for use or consumption. Its capacity for circulation, and its easy convertibility, together with its adaptation to immediate and ready use, would cause a demand for it which a state bond, although bearing interest, could not command. It is contended that, as this was a provision to meet a debt of the state, the purpose was to furnish a fund for payment, and not a circulating medium. But cannot the two co-exist? May not the medium of payment be of such a kind and character as to create in itself a circulating medium? It is not the end which the assumption is to accomplish, but the mode and manner designed, and the use contemplated. The state might issue certificates of indebtedness for the redemption of its bonded debt; but if it did so in the form and manner and design proposed by the act of March 2, 1872, would they be less obnoxious to the objection urged against the revenue bond scrip because they were issued to pay or meet a debt? It is not the purpose of the issue which affects the instrument through which it is made, but the characteristics and incidents which attach

to it as a provision and recommendation for a circulating medium." State v. Comptroller General, 4 S. C., at page 228.

So much of the opinion of Justice Willard (to which reference is made in the foregoing opinion of the supreme court of South Carolina, and whose reasoning they adopted) as bears upon the question whether this scrip was intended for circulation as money follows:

"There are certain characteristics that tend to adapt a paper expressing a promise to pay money, or representing money value, to become current in the community as money. It must be in a form convenient to pass from hand to hand. It must be based either on the credit of a government, a corporation, or an individual, or an association of individuals, or upon a fund pledged or set apart for its redemption. It must either have undoubted credit, such as arises from its ready convertibility into money value, or it must tend to supply some want, natural or artificial, of the community in which it is intended for circulation. It must be placed upon the community in quantity or volume sufficient to create an adequate interest and motive to secure its currency. And finally it must have a certain denominational character, adjusted to the wants of the community in respect to a circulating medium. An examination of the act in question will disclose a clear intent to clothe the obligations in question with attributes fitting them for general circulation as money. These attributes will be considered in the order just stated: (1) Was it intended that the revenue bond scrip should be issued in a form convenient to pass from hand to hand in ordinary transactions of the community? Section 3 gives to the scrip the form most usual and convenient to serve as paper money, viz. that of the usual bank or treasury note. It is to be printed or engraved on steel, in such form and of such denominations as the state treasurer and the president of the Blue Ridge Railroad Company shall determine. The object of referring this authority as to form and denomination to the treasurer and the president of the railroad company is obvious. The treasurer is, by the act, to receive and pay out this scrip from the treasury as money; and the president of the railroad company is to receive the scrip as the representative of his company, and to realize from its employment; and they are most likely to know what qualities as to form and denomination would have the tendency to give the greatest currency to the scrip at the time of its issue. A certain discretion is left with them for such purpose. While the third section determines what shall be the substantial character of the scrip, as importing a pledge of the public faith and credit, the form of the instrument, as adapting it in external appearance to the common notion of money, is left with those most concerned with its currency. (2) It is to be based, by the terms of the act, on the credit of the state government in its sovereign capacity. (3) The act attempts not only to confer upon it the full credit capable of being conferred by the use of the full faith and credit of the state, but to create an artificial want in the community, tending to give it currency. In the first place, it is made receivable in payment of taxes and all other dues to the state, except the special tax levied to pay interest on the public debt. Section 3. Again, it is provided that, if any such scrip is received in the treasury for the payment of taxes, the treasurer is authorized to pay out the same in satisfaction of any claim against the treasury, except interest that may be due on the public debt. Section 5. These provisions contain two distinct features: The first is a permissive feature, affecting each individual in the community who is a taxpayer, and supplying to him a motive to become a purchaser of the scrip. A more energetic means of creating an interest and motive in the community to deal with the scrip as money could not be afforded, short of making the scrip compulsory payment of all debts, as between individuals. The other feature involves the communication to the scrip of the capacity of performing all the functions of money in all dealings between state and individuals, excepting only the payment of interest on the public debt. This last feature can have no other significance than that of giving currency to the scrip as money. It will be observed, from the language of the fourth section, in which the faith and funds of the state are pledged, that such is not, in terms, that

such scrip shall be redeemed by the payment to the bearer, on presentation, of the amount of money called for by it; but the language is 'that the faith and funds of the state are hereby pledged for the ultimate redemption of said revenue bond scrip.' It is only ultimate redemption, not payment on demand, that is covered by this pledge. What is meant by 'ultimate redemption' is made clear by the succeeding clauses of that section. It is provided that a certain tax shall be annually levied for the redemption of the scrip, and it is also provided that the state treasurer shall 'retire at the end of each year from their date one fourth of the amount of the treasury scrip hereby authorized to be issued, until all of it shall be retired, and to apply to such purpose exclusively the taxes hereby required to be levied.' The effect of these provisions is that the holder of the scrip must not look to payment according to the tenor of his scrip, but must seek a market for its circulation under the influence of the pledge of faith and funds for its ultimate redemption. In other words, an attempt is made to give currency to the issue, notwithstanding the absence of any intention or ability to redeem according to the tenor of the promise, by obtaining a credit with the community for the amount of scrip put in circulation, on the strength of certain special provisions, and a general pledge of the faith and funds of the state for its ultimate redemption. (4) The quantity or volume of the contemplated issue is such as tended to create a strong motive and interest in the community to keep the scrip in circulation as money. The amount ($1,800,000), as compared with the extent of the commercial transactions of the community on which that amount was intended to be placed, affords the clearest indication of an intention so to affect the interest of the community as to secure its circulation as money. It was to be placed at once in private hands as valid obligations on the part of the state. The various provisions of the act that looked to a distribution among the people preclude the idea that it was intended that the recipients of this large fund should hold it until redemption, or even that it should be kept together in the hands of a limited number of holders. On the contrary, it was clearly intended for dispersion, and the magnitude of the interest in the hands of the first receivers of the scrip was sufficiently large to warrant the assumption that it would become thus diffused throughout the community. (5) As regards its adaptation in respect of denomination, we have already seen that authority was conferred on those most concerned with its circulation to adapt the issue in that respect to the wants of the community. Such a provision shows additional evidence of an intent that the scrip should circulate as money. Considering the act in its entire aspect, as well as its integral parts, it is clear that the legislature intended that the scrip should circulate as money, and that for this reason the provisions of the act authorizing the issue of scrip are in conflict with the prohibitions of the constitution of the United States as to the emission of bills of credit by states."

In the case of Poindexter v. Greenhow, 114 U. S. 270, 5 Sup. Ct. 903, 962, it was urged that interest coupons attached to bonds of the state of Virginia were bills of credit. These coupons were payable to bearer, and were receivable, at and after maturity, for all taxes, debts, and demands due the state. The supreme court, after reviewing the definition of bills of credit as established by prior decisions, held these coupons not to be bills of credit. They say:

"It is very plain to us that the coupons in question are not embraced within these terms. They are not bills of credit, in the sense of this constitutional prohibition. They are issued by the state, it is true. They are promises to pay money. Their payment and redemption are based on the credit of the state, but they were not emitted by the state in the sense in which a government emits its treasury notes, or a bank its bank notes—a circulating medium or paper currency—as a substitute for money. And there is nothing on the face of the instruments, nor in their form or nature, nor in the terms of the law which authorized their issue, nor in the circumstances of their creation or use, as shown by the record, on which to found an inference that

these coupons were designed to circulate, in the common transactions of business, as money, nor that in fact they were so used. The only feature relied on to show such a design or to prove such a use is that they are made receivable in payment of taxes and other dues to the state. From this it is argued that they would obtain such a circulation from hand to hand as money as the demand for them, based upon such a quality, would naturally give. But this falls far short of their fitness for general circulation in the community as a representative and substitute for money in the common transactions of business, which is necessary to bring them within the constitutional provision against bills of credit. The notes of the Bank of Arkansas, which were the subject of controversy in Woodruff v. Trapnall, 10 How. 190, were by law receivable by the state in payment of all dues to it, and this circumstance was not supposed to make them bills of credit. It is true, however, that in that case it was held they were not so because they were not issued by the state and in its name, although the entire stock of the bank was owned by the state, which furnished the whole capital and was entitled to all the profits. In this case the coupons were issued by the state of Virginia, and in its name, and were obligations based on its credit, and which it had agreed, as one mode of redemption, to receive in payment of all dues to itself in the hands of any holder; but they were not issued as and for money, or with the design to facilitate their circulation as such. It was conferred, as is apparent from all the circumstances of their creation and issue, merely as an assurance, by way of contract with the holder, of the certainty of their due redemption in the ordinary transactions between the state treasury and the taxpayers. They do not become receivable in payment of taxes till they are due, and the design, we are bound to presume, was that they would be paid at maturity. This necessarily excludes the idea that they were intended for circulation at all."

There are certain resemblances and several marked differences between the Virginia coupons, which were held not to be bills of credit, and the South Carolina bond scrip. The coupons and the scrip are alike in that they are obligations and indebtedness of the state. They are receivable by the state treasurer in payment of taxes and other dues to the state, and their redemption is based upon the faith and credit of the state. Their dissimilarity lies in the fact that the coupons are to be paid on a day certain, while the scrip is not payable at any particular time, but is only to be redeemed or retired from year to year. The coupons are receivable in payment of taxes and other dues to the state only at and after maturity, while the scrip may be used for these purposes from the date of its issue. The coupons are paid and retired when received by the state, but the scrip may be reissued from the state treasury, as often as received, in satisfaction of all claims against the state, except for paying interest on the public debt. In deciding the Virginia coupons not to be bills of credit, the supreme court applied certain tests to determine whether they were intended to constitute a paper currency or circulating medium. Apply these tests to the South Carolina bond scrip. The scrip are, on their face, bills receivable of the state of South Carolina. In their form and nature they are like bank and treasury notes. The terms of the law authorizing their issue show that they were intended for circulation between the government and the people as money. By the power given to the state treasurer and the president of the railroad company to fix the amount of the scrip, which power was exercised so as to make the denomination as low as one dollar, by reason of their bearing no interest, by the provision as to the form of the scrip, the great volume of the issue, and the scrip

90 F.—11

being noninterest bearing, its circulation was necessary to sustain its value. They could be used for the payment of taxes and other dues to the state from the date of their issue, and before any part of them were required to be redeemed or retired. The reasoning of the supreme court of South Carolina and of Justice Willard, quoted in this opinion, is so full and convincing that the court feels constrained to follow their decision. Looking at the South Carolina bond scrip in the light of these decisions, and the opinion of the supreme court of the United States in the case of Poindexter v. Greenhow, it is quite clear that they are bills of credit, within the prohibition of the constitution of the United States. But the complainant urges that the redemption of the revenue bond scrip did not depend solely upon the good faith of the state, because, as between the state and the railroad company, it was in the power of the state to enforce its payment against the railroad company, and that consequently one of the essential elements going to make up the bill of credit is lacking. The case of Hagood v. Southern, 117 U. S. 64, 6 Sup. Ct. 608, is cited in support of this contention. The supreme court in that case say:

"As between the railroad company and the state, the former is primarily liable for any debts represented by the revenue bond scrip [the scrip before the court in this case], or for which it is held by others for security, and is bound to indemnify the state against loss on account of its suretyship."

It will be noted that the court does not hold the railroad company in any way remotely liable for the redemption of the scrip as between the holder and the company. The railroad company is a total stranger to the contract, and in no event has the holder of the scrip any recourse to the railroad company in the event of the failure of the state to redeem the scrip. The good faith of the state is the only pledge for the redemption of the scrip. While the act authorizing the issue of the scrip provided a fund for its redemption, to be raised by taxation, yet its payment out of that fund rests upon the faith of the state. Darrington v. Bank, 13 How. 12.

The opinion of this court is that the South Carolina bond scrip issued under and in pursuance of the act of March 2, 1872, are bills of credit, within the prohibition of the constitution of the United States, and therefore void. The tender of the scrip by Alexander to the state treasurer of South Carolina was not a valid tender, and did not operate to extinguish the mortgage given by Alexander to the state. The said Agricultural Hall property is still incumbered by the mortgage, and complainant cannot give defendant a clear title to it. Complainant is not entitled to the relief asked in the bill of complaint. The conclusion we have arrived at makes it unnecessary to determine the question of the violation of the constitution of South Carolina in the enactment of the law providing for the issue of the scrip certificates. The bill of complaint is dismissed at complainant's costs.