## TUCHMAN v. WELCH, County Attorney.

### YOUNT v. SAME.

*(Circuit Court, D. Kansas. July 16, 1890.)*

1. CONSTITUTIONAL LAW—SUITS AGAINST A STATE—INJUNCTION.

  Comp. Laws Kan. 1885, c. 35, § 13, provides that the county attorney of any county in which a liquor nuisance exists may maintain an action in the name of the state to abate and perpetually enjoin it, and that "any person violating the terms of any injunction granted in such proceedings shall be punished as for contempt." *Held,* that a suit to restrain the county attorney from instituting proceedings for contempt against one who has violated such injunction, is not a suit against the state, within the meaning of Const. U. S. amend. 11, which in effect prohibits suits against a state, without its consent, in the United States circuit court.·

2. SAME—PROCEEDINGS IN STATE COURT—CONTEMPT.

  Nor is an injunction against the institution of such contempt proceedings an injunction against the proceedings of a state court, which, by Rev. St. U. S. § 720, the federal courts are forbidden to grant, except in cases of bankruptcy.

8. SAME—INTOXICATING LIQUORS—ORIGINAL PACKAGES.

  Since a state law prohibiting the sale of intoxicating liquors by non-resident importers, in the same packages in which they were brought into the state, is void as being in contravention of the interstate commerce clause of the federal constitution, where a state court has enjoined such sales an injunction will lie from the federal courts against the institution of contempt proceedings by the county attorney for the violation of the state injunction under Comp. Laws Kan. 1885, c. 35, § 13; since Rev. St. U. S. § 1979, provides that any person who, under color of any state law or statute, subjects another to the deprivation of any rights, privileges, or immunities secured by the constitution of the United States, shall be liable to the injured person in an action at law or suit in equity, to be prosecuted in the federal courts.

In Equity.   On bill for injunction.

This litigation grows out of substantially the following state of facts: The supreme court of the United States having recently decided, under the prohibition law of the state of Iowa, that non-resident manufacturers or vendors of liquors, wines, and beer had the right to import such articles or commodities into the state of Iowa (*Leisy* v. *Hardin,* 10 Sup. Ct. Rep. 681,) and, as a consequence of the right of importation, the further right of making sales of those commodities in the form of the original packages in which they were shipped, anything in the state law to the contrary notwithstanding, the Anheuser-Busch Brewing Association, a corporation of the state of Missouri, imported from its business house in the city of St. Louis, Mo., quantities of beer, consigned to the petitioner Bernard Tuchman, as its agent, at the city of Topeka, in the state of Kansas; the said Tuchman also being a citizen of the state of Missouri. The Joseph Schlitz Brewing Company, a corporation of the state of Wisconsin, imported therefrom into the state of Kansas large quantities of beer, consigned to the petitioner Landis Yount, as its agent; the said Yount being also a citizen of the state of Wisconsin. · And, as claimed by said petitioners, the said agents sold said beer in the state of Kansas in the original packages in which they were imported, and not otherwise.

As these two cases involve substantially the same questions of law, the case of Tuchman will here be considered.   While complainant was thus

engaged, on the 28th day of May, 1890, the respondent, Welch, acting as county attorney of Shawnee county, in which the petitioner was conducting such business, filed in the district court of said county an information charging the petitioner with selling intoxicating liquors in violation of the prohibitory law of Kansas, and caused the arrest and confinement in jail of the petitioner; from which arrest and imprisonment the petitioner was delivered on proceedings by a writ of *habeas corpus* sued out of the United States circuit court for the district of Kansas, (*ante,* 545,) presided over by the Honorable HENRY C. CALDWELL, circuit judge. Said discharge was made, after a full hearing of the facts, on the ground that the petitioner was pursuing a lawful business under the constitution of the United States, as declared by the recent decision of the supreme court of the United States in the said Iowa case; that the beer had been imported into Kansas from Missouri, and was being sold in the original packages, and not otherwise, by the petitioner, as agent of the said brewing company, and therefore his restraint under the warrant of arrest was in violation of his constitutional rights as a citizen of the United States.

On the same day of his said arrest, the said Welch also commenced an action, authorized by the state statute of Kansas, against petitioner, in the district court aforesaid, to enjoin the petitioner from prosecuting and carrying on his said business as agent of said corporation. The bill of complaint herein charges that: "Said Welch then well knew, as he now knows, that the petitioner was so selling beer for said brewing company imported into the state in the original packages in which the same was imported, and not otherwise." That said Welch caused to be issued from said district court an order of injunction, without notice to petitioner, and without indemnifying bond, enjoining him from selling such beer, which injunction proceeding was predicated of the same facts as those upon which the arrest was made, and for which this court held he was not liable to prosecution in the *habeas corpus* proceeding. That, notwithstanding the petitioner's said discharge by this court, upon the resumption of his business, as he was thereby authorized to do, the said Welch, under color of the prohibitory law of the state of Kansas, which, as respects the said business of the petitioner, is in conflict with the constitution of the United States, subjects the petitioner to the deprivation of his right to sell the said beer, as the agent of said foreign corporation, in the original packages, as aforesaid. That he has caused the said business of the complainant to be closed up and suspended for a long time, and that he designs and threatens to continue to deprive petitioner of his said rights by wrongfully and unlawfully contriving to worry and oppress said petitioner in his lawful business, and to that end he threatens and is about to proceed to obtain from said district court process for contempt of said injunction order, and to have this petitioner arrested thereunder, confined, and imprisoned, and thereby subject him not only to the interruption and destruction of his business, but also to great expense and trouble in defending said prosecutions, and necessitating further writs of *habeas corpus* for his discharge, to his great

and irreparable injury. He therefore asks for a temporary restraining order, and for an injunction, upon final hearing, restraining the respondent from the further annoyance, harassment and prosecution of the petitioner for the same and like causes.

Before FOSTER and PHILIPS, JJ.

*David Overmyer*, for complainants.

*L. B. Kellogg*, Atty. Gen., and *R. B. Welch*, Co. Atty., for defendant.

PHILIPS, J. By order of the circuit judge, I assisted the district judge in the hearing, and submit the following views of the questions involved:

1. This application is met at the threshold with the objection that it contravenes the eleventh amendment of the federal constitution, which in effect denies the right of a citizen to sue one of the states without its consent. The law is now well settled that the state without its consent cannot be sued in the circuit court of the United States by one of its own citizens, or a non-resident citizen, even upon the suggestion that the case is one arising under the constitution and laws of the United States. *Hans* v. *Louisiana*, 134 U. S. 1, 10 Sup. Ct. Rep. 504. If, therefore, this action can be rightly considered as a suit in equity commenced or prosecuted against the state of Kansas, it must fail, and any further discussion of the many questions raised in this controversy would be supererogatory. The question as to what in law fixes and determines the fact as to when a suit is against a state has undergone rigid investigation by the federal courts. In the early rulings of the supreme court it was held that, where jurisdiction depends on the party, it is the party named in the record. *Osborn* v. *Bank*, 9 Wheat. 738–857. In *Governor* v. *Madrazo*, 1 Pet. 110, where the action was brought against the governor in behalf of the state, it was held that in legal effect it was against the state, because "the demand made upon him is not made personally, but officially. The decree is pronounced, not against the person, but the officer. * * * In such a case, where the chief magistrate of a state is sued, not by his name, but by his style of office, and the claim made upon him is entirely in his official character, we think the state itself may be considered as a party on the record. If the state is not a party, there is no party against whom a decree can be made. No person in his natural capacity is brought before the court as defendant." In *Cunningham* v. *Railroad Co.*, 109 U. S. 446, 3 Sup. Ct. Rep. 292, 609, it was held that, in those cases where it is manifest upon the record that the state is an indispensable party to enable the court to grant any relief, it would refuse jurisdiction. In other words, when it is clear that the party proceeded against has no individual interest in the controversy, and the state alone is to be affected by the judgment, and the decree would be inoperative unless against the state, it may be deemed as a proceeding against the state. This question underwent thorough discussion in *Re Ayers*, 123 U. S. 443, 8 Sup. Ct. Rep. 164, where it was held that, although the matter out of which the controversy arose was against Ayers as attorney general and other offi-

cers of the state in their official capacity, yet, as the real purpose was to enforce a right founded in contract to which the state was a party alone, and any judgment the court might render could be effectual only as against the state, the state was a necessary party, and in the case under review was constructively present by its officers. "In such a case," says Mr. Justice MATTHEWS, "though the state be not nominally a party on the record, if the defendants are its officers and agents, through whom alone it can act in doing and refusing to do the things which constitute a breach of its contract, the suit is still in substance, though not in form, a suit against the state." The learned justice then confronts the very issue presented by the bill of complaint now under consideration. He says:

"It may be asked, what is the true ground of distinction, so far as the protection of the constitution of the United States is invoked, between the contract rights of the complainant in such a suit and other rights of person and of· property? In these latter cases it is said that jurisdiction may be exercised against individual defendants, notwithstanding the official character of their acts, while in cases of the former description the jurisdiction is denied."

He then proceeds to show that the acts alleged to be threatened by Ayers and others are in violation of the contract made by the state of Virginia, which it alone could perform, and the acts of defendants are but the acts of the state, and nothing done or said by them constituted a breach of the contract, the breach of which constitutes the whole *gravamen* of the action; and as the judgment sought would bind the state, if effective, and not any individual act of the defendants, it should be deemed the act of the state. The opinion then very pertinently proceeds as follows:

"But this is not intended in any way to impinge upon the principle which justifies suits against individual defendants who, under color of the authority of unconstitutional legislation by the state, are guilty of personal trespasses and wrongs, nor to forbid suits against officers in their official capacity, either to arrest or direct their official action by injunction or *mandamus*, where such suits are authorized by law, and the act to be done or omitted is purely ministerial, in the performance or omission of which the plaintiff has a legal interest. * * * Nor need it be apprehended that the construction of the 11th amendment, applied in this case, will in any wise embarrass or obstruct the execution of the laws of the United States in cases where officers of a state are guilty of acting in violation of them under color of its authority. The government of the United States, in the enforcement of its laws, deals with all persons within its territorial jurisdiction, as individuals owing obedience to its authority. The penalties of disobedience may be visited upon them, without regard to the character in which they assume to act, or the nature of the exemption they may plead in justification. Nothing can be interposed between the individual and the obligation he owes to the constitution and laws of the United States which can shield or defend him from their just authority; and the extent and limits of that authority the government of the United States, by means of its judicial power, interprets and applies for itself. If, therefore, an individual acting under the assumed authority of a state, as one of its officers, and under color of its laws, comes into conflict with the superior authority of a valid law of the United States, he is stripped of his representative character, and subjected in his person to the conse-

quences of his individual conduct. The state has no power to impart to him any immunity from responsibility to the supreme authority of the United States."

The separate opinion of Mr. Justice FIELD shows quite clearly the true line of demarkation:

"There are many cases—indeed, they are of frequent occurrence—where officers of the state, acting under legislation in conflict with the constitution and laws of the United States, may be restrained by the federal courts, as where those officers attempt, by virtue of such legislation, to take private property for public use without offering compensation, or in other ways to deprive one of the use and enjoyment of his property. I do not understand that the opinion of the court is against this doctrine; but, on the contrary, that it is recognized and approved. There is a wide difference between restraining officers of the state from interfering in such cases with the property of the citizen, and restraining them from prosecuting a suit in the name of the state, in her own courts, to collect an alleged claim."

See, also, *Hagood* v. *Southern*, 117 U. S. 70, 6 Sup. Ct. Rep. 608. The court maintained that the *ratio decidendi* of the *Ayers Case* was consistent, when the facts of each are understood, with what was uttered in *Davis* v. *Gray*, 16 Wall. 203.

"Making a state officer a party does not make the state a party, although her law may have prompted his action, and the state may stand behind as the real party in interest."

The state of Kansas is not a party to this record, nor can the injunction, if granted, affect or bind the state as such. The order of restraint would operate upon the respondent, Welch, *in personam*, to stay him from taking any further action looking to the employment of the instrumentalities of the state to enforce against the complainant a dormant interlocutory decree of the state court, which he is not required to invoke, because its enforcement would be violative of the constitutional rights of the petitioner. No obligation in law or morals rests upon the respondent to do that which would be violative of the supreme law of the land; and no right or interest of the state can be invaded or impaired by restraining the respondent from an act which, if done, would at once be nullified by this court by discharging the prisoner from any arrest under the threatened proceeding. This court having already discharged the petitioner from the arrest under the criminal proceeding out of which the temporary injunction granted by the state grew, as an ancillary proceeding, on the same essential facts, a like discharge would inevitably follow under any proceeding for contempt. For any action taken by respondent after the adjudication in the *habeas corpus* case, looking to the further prosecution and punishment of the accused on the same character of facts, would be a trespass upon the petitioner's constitutional liberty, inviting an action for malicious prosecution, in which the respondent could take no shelter behind the state, and for which the state would in no wise be answerable. The section of the Kansas statute (section 13, c. 35, Comp. Laws 1885) under which the respondent instituted the injunction proceeding simply provides that "the attorney general, county attorney, or any citizen of the county

where such nuisance exists, or is kept, or is maintained, may maintain an action in the name of the state to abate and perpetually enjoin the same. The injunction shall be granted at the commencement of the action, and no bond shall be required. Any person violating the terms of any injunction granted in such proceedings shall be punished as for contempt by a fine of not less than one hundred nor more than five hundred dollars, or by imprisonment in the county jail not less than 30 days nor more than six months, or by both such fine and imprisonment, in the discretion of the court." This proceeding is not mandatory on the county attorney. He may or may not invoke it. Any citizen, as well as he, may put it in motion at his option. Being advised, as he is, by the decision of the supreme court of the United States in the Iowa case, as also by the decision of the United States circuit judge, that the proceeding against the petitioner is in the face of the supreme law of the land, he can be under no possible obligation of official duty or good citizenship to make further attempt to enforce the dormant order of injunction; and his threatened purpose to do so, in this view, is a seeming defiance of law, and a menace to the liberty of the petitioner, and of his right to pursue a lawful business. In such conjecture, it seems to me, it would be unjust to the state that it could be deemed a party to be restrained from such wanton and unauthorized prosecution.

2. It is next objected that this action is interdicted by section 720, Rev. St. U. S., which declares that the writ of injunction shall not be granted by any United States court to stay proceedings in any state court except where authorized in cases of bankruptcy. This statute is quite comprehensive. It extends to all proceedings first instituted in the state courts, and protects both the court, as such, and the parties to the pending action in the state court. *Peck* v. *Jenness,* 7 How. 625; *Haines* v. *Carpenter,* 91 U. S. 254; *Dial* v. *Reynolds,* 96 U. S. 340; *Wagner* v. *Drake,* 31 Fed. Rep. 849. It must be kept in mind, in this discussion, that neither the court nor the parties are here sought to be enjoined. It must also be kept in mind what the threatened acts are about to be committed by respondent which are sought to be restrained. The complaint is that while petitioner is in the peaceable pursuit of a commerce recognized by the constitution of the United States, recently affirmed by the highest tribunal of the nation, the respondent, under color of his office as county attorney, in disregard of the said right of the petitioner, and of the recent decision of this court through its circuit judge, (*ante,* 545,) instigated by a purpose to harass the petitioner by repeated vexatious prosecutions, to the injury of his business and the interference with his personal liberty, threatens to proceed with and prosecute further said injunction, thereby compelling him to incur expense and trouble in defending the same. None of the imputed acts threatened by respondent is he required by any valid law to do. As already stated, the state statute under which he obtained the writ of injunction is but permissive to him. He is not required to appeal to it. No proceeding threatened has been instituted. No proceeding of the court is asked to be restrained;

only the unwarranted, voluntary, pernicious interference of the respondent. The information lodged by him with the district court is in the ordinary form under the state law as against any retail liquor dealer violating the local prohibitory law of the state. There is nothing on the face of the information to advise the state court that the accused was acting as the agent of a non-resident importer, or that the liquor was shipped by the manufacturer from another state, and was being sold by the agent in the original package. On the face of the complaint, therefore, the injunction order was properly issued by the state court, if the statute authorizing it be in this particular constitutional. The whole wrong, therefore, done the petitioner was instigated and brought about by the respondent. And while it is not to be imputed that the state court, after the discharge of the petitioner by this court under the writ of *habeas corpus*, would proceed further in such injunction, if advised of the facts as they appear on the face of the bill of complaint herein, yet the danger to which the petitioner is exposed is that, before any hearing can be accorded him on the merits, the respondent threatens and may on the facts stated in his said information, and the injunction obtained therein, cause his arrest, fine, and imprisonment, and injury of his property interest, because the court in the contempt proceeding might only look to the fact as to whether or not its order had been disobeyed without more.

It is but just, in this connection, to respondent, to state that he has, in addition to his demurrer to the bill, filed his affidavit in which he disclaims any purpose to oppress or injure the petitioner, and protests that he is actuated solely by a sense of official duty, and in no spirit of rebellion against the decisions of the federal courts. But it is difficult to read his affidavit as a whole, and observe its repeated asseverations that he proposes to proceed only according to law, without receiving the impression that his position is equivocal and disingenuous. He does not state what law he proposes to pursue, whether the law as construed by the supreme court of the United States and this court, through his honor, Judge CALDWELL, or the law of the state of Kansas, under which he holds his office, and acts; and the course of argument pursued at this hearing indicates that he does not yield a willing obedience to the law, in so far as it is in conflict with that under which he holds his office. Unquestionably, if he claims and can show that the petitioner is not the agent of a foreign importer, or is not selling in the original packages in which the beer was shipped, or that he is making his house of business a mere tippling concern for the rendezvous of disorderly people, bringing it within the police power of the state to declare it a nuisance, he has a perfect right to proceed in the state court, and this court should not, and would not, interfere. But on this preliminary hearing, accepting the demurrer as confessing the facts alleged in the bill, we are confronted with this anomalous state of affairs: The supreme court of the United States has decided that under the constitution of the United States the non-resident manufacturer or merchant has a right to import beer and liquors into the state of Kansas, and to sell them as thus

packed in said state, any law or regulation of the state to the contrary notwithstanding. This is no new doctrine to me. The supreme court of the state of Missouri, 32 years ago, in *State* v. *Shapleigh*, 27 Mo. 344, and in *State* v. *North*, Id. 464, applied this doctrine in all its force to the case of the importation of boots and shoes from Boston to Missouri, which the state law, by unfriendly legislation, sought to exclude; and as shown in that opinion, as also by that of the supreme court of the United States, it has been the law of the land, as declared in *Brown* v. *State*, 12 Wheat. 419, for 60 years past. As applied to the constitutional aspect of the question, there can be no difference between shoes and beer. For thus exercising this constitutional right, the respondent caused petitioner's arrest under the conflicting state law of Kansas, and had him imprisoned. The prisoner appealed to this court for his discharge, by the writ of *habeas corpus*, and on a full, free hearing the court of competent jurisdiction discharged him, and he resumed business as theretofore. *Ante*, 545. Then, under the injunction granted cotemporaneously with the said warrant, and in aid of it, the respondent proposes to continue to pursue the accused as for a contempt for doing that which the order of discharge, in its legal consequence, authorized him to do.

Impotent indeed must be the government whose judicial branch is without the power to challenge such repetitious infractions of the citizen's personal liberty and constitutional right to pursue a lawful avocation. If arrested for such contempt, this court would in duty feel bound to discharge him on *habeas corpus* proceeding on the admitted facts. But the respondent could again have him arrested under the same injunction as often as he might be so discharged, and resume the prosecution of his business. If a case could ever arise to call into action the powers of a court of chancery to prevent the multiplicity of suits, and the harassment and persecution of the citizen, this certainly presents the strongest appeal to such protective power.

Under the act of congress of 1867 authorizing the citizen, when restrained of his liberty contrary to the constitution, to appeal to this court for a writ of *habeas corpus*, the party so holding him is allowed three days in which to make his return. And, as experience shows, in all the writs of *habeas corpus* which have recently be applied for in this court the respondent has claimed his three days in which to make return for the sheriff; so that the applicant, guilty or innocent, is kept in jail during this period before he can have a hearing and secure his liberty. So that, if he is to be remitted to that remedy which is the most expeditious known to the law side of the court, it is most inadequate. The fourteenth amendment to the federal constitution recognizes the fact, and declares that all persons born or naturalized in the United States are citizens of the United States, as well as of the state wherein they reside. Having thus proclaimed their citizenship, the government recognizes its obligation to extend protection where it expects allegiance. So the first section of the amendment declares:

"No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any

person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the law."

This is a direct restraint on the powers of the state, and, of consequence, on its officers and ministerial agents, through whom it might attempt any of the forbidden deprivations. *In re Ah Lee*, 5 Fed. Rep. 902. Mr. Justice FIELD, in the *Railroad Tax Cases*, 13 Fed. Rep. 722, shows that, while the amendment in question had its origin in the purpose to secure to the newly-made citizens the full enjoyment of their freedom and rights, yet "the generality of the language used extends the protection of its provisions to persons of every race and condition against discriminating and hostile state action of any kind. Its effect in preserving free institutions, and preventing harsh and oppressive state legislation, can hardly be overstated. * * * Its authors, seeing how possible it was for the state to oppress without relief from the federal government, placed in the constitution an interdict upon their action, which makes lasting oppression of any kind by them under the form of law impossible." Then, discussing the causes which led up to the enactment of the thirteenth, fourteenth, and fifteenth amendments, and the scope of their operation, he says:

"Had the population of the United States continued as sparse as when the constitution was formed, and the means of more rapid intercourse between the states had not been invented, it is possible that further amendments would not have been demanded. But the immense development of the resources of the country, the great increase of population, the constant intercourse between the states by steam, railway, and telegraph, changed the business and commercial relations of the states to each other, and led the people of one section to seek a closer union, and to desire a greater authority to be exercised by the central government, while the peculiar institutions of the other section, and the different industries they developed, led its people to desire to limit, rather than strengthen, the central authority. Differences of opinion in matters of internal policy, and the estrangement engendered by controversies growing out of the existence of slavery in some of the states, ultimately culminated in civil war. Men then saw that danger was to be apprehended in a direction opposite to that which led to the original amendments. Restraints upon the power and action of the states were therefore suggested; and to impose them, and abolish slavery,—the great cause of the civil conflict,—the new amendments * * * were adopted."

In the case of *Life-Stock, etc., Ass'n v. Crescent City, etc., Co.*, 1 Abb. (U. S.) 388, Mr. Justice BRADLEY expressed the same view. He said:

"It is possible that those who framed the article were not themselves aware of the far-reaching character of its terms. They may have had in mind but one particular phase of social and political wrong which they desired to redress. Yet, if the amendment as framed and expressed does in fact bear a broader meaning, and does extend its protecting shield over those who were never thought of when it was conceived and put in form, and does reach social evils which were never before prohibited by constitutional enactment, it is to be presumed that the American people, in giving it their *imprimatur*, understood what they were doing, and meant to decree what in fact has been decreed."

Further on he observes:

"The legislature has an undoubted right to make all police regulations which they may deem necessary (not inconsistent with constitutional restrictions) for the preservation of the public health, good order, morals, and intelligence; but they cannot, under the pretense of a police regulation, interfere with the fundamental privileges and immunities of American citizens. The question has its limits in both directions; and whilst we are to be specially careful not to do anything that may trench upon the vast and almost limitless field of legislation, where the will of the people is supposed to be most freely and powerfully expressed, it is nevertheless our duty, with a firm and unflinching hand, to prevent the invasion of any clear and undoubted individual rights of the citizen which are secured to him by the constitution."

It is true that in *Slaughter-House Cases,* 16 Wall. 36, by a divided court, it was held that the provisions of the fourteenth amendment did not apply to the facts of that case, on the ground that the privileges and immunities secured thereby pertained to such as were the peculiar, inherent rights of citizens of the United States, as contradistinguished from those of the citizen of the state; and that, as the act of the state legislature came within the police power of the state, it was not in contravention of the federal constitution. But the learned judge concedes (page 72 of the opinion) that, while the newly-enfranchised negroes were uppermost in the minds of congress in framing the amendments, yet this language is so comprehensive as to extend its limitation to other rights assailed by the states, though the party interested may not be of African descent. Mr. Justice SWAYNE, in his separate opinion, makes this pungent indisputable declaration:

"Life, liberty, and property are forbidden to be taken ' without due process of law,' and ' equal protection of the laws ' is guarantied to all. Life is the gift of God, and the right to preserve it is the most sacred of the rights of man. Liberty is freedom from all restraints but such as are justly imposed by law. Beyond that line lies the domain of usurpation and tyranny. Property is everything which has an exchangeable value, and the right of property includes the power to dispose of it according to the will of the owner."

In the *Live-Stock, etc.,* Ass'n Case, *supra,* Mr. Justice BRADLEY had at first reached the conclusion that the civil rights bill as it then existed did not apply to the case in hand, and that, inasmuch as congress had not then legislated to carry into effect the provisions of the fourteenth amendment, he felt constrained to apply the provisions of said section 720, Rev. St., to the case, and refuse the injunction, in so far as it sought to restrain the state officers from proceeding in the case then pending in the state court. After a night's rest and deliberation, he delivered a supplemental opinion, in which he said:

"While we still hold that the act is not intended to enlarge the privileges and immunities of white citizens, it must be construed as furnishing additional guaranties and remedies to secure their enjoyment; and this is probably the reason why congress has neglected to pass an additional law for carrying the 14th amendment into effect, the civil rights bill being regarded as having already supplied the necessary provisions for that purpose."

This opinion was delivered at the April term, 1870, of the Louisiana district court. And this brings us to a most significant matter. After

this discussion, on the 20th day of April, 1871, congress passed an act entitled "An act to enforce the provisions of the fourteenth amendment to the constitution of the United States, and for other purposes." 17 St. U. S. 13. The first section of this act is as follows:

"That any person who, under color of any law, statute, ordinance, regulation, custom, or usage of any state, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the constitution of the United States, shall, any such law, statute, ordinance, regulation, custom, or usage of the state to the contrary notwithstanding, be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress; such proceeding to be prosecuted in the several district or circuit courts of the United States, with and subject to the same rights of appeal, review upon error, and other remedies provided in like cases in such courts under the provisions of the act of the ninth of April, eighteen hundred and sixty-six, entitled 'An act to protect all persons in the United States in their civil rights, and to furnish the means of their vindication,' and other remedial laws of the United States which are in their nature applicable in such cases."

This is as comprehensive as it is explicit. It applies to any person, no matter who, officer or layman, who, under color of any law, statute, etc., of any state, shall subject, or cause to be subjected, any person within the whole jurisdiction of the federal government to the deprivation of any right, privilege, or immunity secured by the constitution, and declares that he shall, notwithstanding any law, statute, regulation, etc., of the state, be liable to the party aggrieved in any action at law, suit in equity, or such proper proceeding for redress. And it throws wide open the doors of the federal courts as the altar of justice for his refuge. This section is carried forward into the Revised Statutes by section 1979. Can it be doubted that, if this statute had been before Mr. Justice BRADLEY in the *Live-Stock, etc., Ass'n Case,* he would have hesitated to apply it, and grant the injunction? It is true, the act does not unconditionally repeal said section 720; but the seventh section declares "that nothing herein contained shall be construed to supersede or repeal any former act or law, except so far as the same may be repugnant thereto." So, while section 720 remains operative and applicable in other matters and respects as heretofore; yet, if it be repugnant to any of the provisions of the later act of April 20, 1871, so as to prevent the redress and the remedies designed by it to the party whose constitutional rights and privileges are obstructed by any adverse state action, it is in so far superseded and inapplicable.

Suppose the state of Missouri should enact a law prohibiting any colored citizen from exercising the right of suffrage, and provide for his arrest and criminal prosecution for voting, with the auxiliary proceeding that the proper county attorney might also apply for an injunction, and perpetually enjoin him from exercising his constitutional privilege; that, under such law, he should be arrested and enjoined; and, after he had been discharged from arrest by the writ of *habeas corpus,* the said officers should threaten to proceed against him as for contempt, under such injunction, for renewing the effort. Would it be questioned that the

United States court could entertain a bill in equity under the act of 1871 to restrain such officer, especially so under circumstances indicating a settled purpose on the part of such officer to harass and oppress the voter, and possibly to drive him from the state? The constitution and the law recognizes no distinction as to color or equality of right. The right to liberty and property, and the equal protection of the laws in the pursuit of a lawful avocation, are alike sheltered under the broad *ægis* of the constitution, and congress has placed at the command of the citizen every weapon in the whole armory of justice for the protection of such constitutional rights. The equitable remedy of injunction for the protection of rights and property, and the prevention of wrongs, is affirmative, as well as negative. Pomeroy, in his work on Equity Jurisprudence, (volume 3, § 1338,) declares that:

"Wherever a right exists or is created by contract, by the ownership of property, or otherwise, cognizable by law, a violation of that right will be prohibited, unless there are other considerations of policy or expediency which forbid the resort to this prohibitive remedy. The restraining power of equity extends, therefore, through the whole range of rights and duties which are recognized by the law, and would be applied to every case of intended violation, were it not for certain reasons of expediency and policy which control and limit its exercise."

The equity jurisprudence to prevent the commission of wrong is only limited to the instance where a tort may not be adequately compensated in damages. It is too palpable to admit of debate, as already shown, that the remedies by law, and the usual course of procedure thereunder, would afford no adequate protection in this case, assuming the allegations of the bill to be true.

It is urged with much force by the learned counsel for petitioner that so much of said section 13 of the Kansas statute which authorizes a temporary injunction to issue without bond, and without any notice to the party sought to be restrained, is not due process of law. On the contrary, it is insisted by the attorney general that this objection is disposed of in the case of *Mugler* v. *Kansas*, 123 U. S. 623, 8 Sup. Ct. Rep. 273. The conclusion apparent to my mind to be drawn from what Mr. Justice HARLAN said respecting this statute is that he assumed that under such a proceeding notice would be given, and a full hearing had in the matter of declaring such a nuisance. The statute itself, it is true, does not provide for a preliminary notice before the temporary injunction is granted; but the court evidently assumed that in such a proceeding, before the property rights of the defendant should be affected, notice would be given; whereas the bill of complaint here alleges that without any such notice the court granted the preliminary injunction, the effect of which would be to close up the defendant's place of business, without bond of indemnity, until such time as a hearing might be had finally upon the merits. It is a principle of universal law, in the administration of justice, that no step can be taken by a court affecting the life, liberty, or property of the citizen without first giving him notice thereof. "The law loathes a judgment without a hear-

ing." *Smith* v. *Taylor,* 11 Ga. 22. FORTESCUE, J., in *Rex* v. *Chancellor,* etc., 1 Strange, 557, said:

"The laws of God and man both give the party an opportunity to make his defense, if he has any. \* \* \* Even God himself did not pass sentence upon Adam before he was called upon to make his defense."

Mr. Justice FIELD, in the *Railroad Tax Cases,* 13 Fed. Rep. 751, says:

"It conflicts with the great principle which lies at the foundation of all just government that no one shall be deprived of his life, his liberty, or his property without an opportunity of being heard against the proceeding. The principle is as old as *Magna Charta,* and is embodied in all the state constitutions, and in the fourteenth amendment of the federal constitution. The provision in this amendment is in the form of an interdict upon the states,— 'nor shall any state deprive any person of life, liberty, or property without due process of law.' \* \* \* It must give to the party to be affected an opportunity of being heard respecting the justice of the judgment sought. Without these conditions entering into the proceeding, it would be anything but due process. If it touched life or liberty, it would be wanton punishment, or, rather, wanton cruelty. If it touched property, it would be arbitrary exaction."

It does seem to me that it is no answer to the want of notice in this case that an opportunity will be given the petitioner at the final hearing as to whether the injunction shall be made perpetual; for in the preliminary proceeding, without notice, and without an opportunity, by affidavit or otherwise, to enter his protest, and to bring to the attention of the court tangible, palpable facts, or the opportunity to be heard by counsel, an order of restraint is laid upon the party accused of levying a nuisance, and his place of business summarily closed up, and his business for the time may be interrupted, and seriously, if not irreparably, injured. But I will not press this matter beyond these suggestions.

A most earnest appeal is made by respondent to this court to leave unmolested the officers of the state in this controversy to proceed through the customary channels of the state courts, leaving the petitioner his remedy, after final decision in the court of last resort in the state, of appealing to the United States supreme court. We sensibly recognize the importance of the rule of comity invoked, as essential to the preservation of the harmony and peaceful operation between the courts of the two jurisdictions; but I feel sure that in the coming time of dispassionate consideration and calmer reflection, when the feverish excitement of popular local sentiment shall give way to reason and a broader national spirit, the intelligence and patriotism of counsel will pronounce judgment for his constituents acquitting the federal judiciary in this controversy of the imputation of unduly interfering, when they are executing the high behests of the federal constitution. Is it not, rather, the respondent and his abettors who should recognize this rule of comity? The supreme court of the United States has declared so much of the law of Kansas as prohibits the importation of liquors, etc., into the state, and their sale therein in the original package, as unconstitutional. The United States circuit judge, in obedience to his oath of office, has reaffirmed and applied that decision to these prosecutions. Until congress

shall interpose, and confer upon the state the right to regulate this matter, loyalty to the supreme law of the land, and the obligation of good citizenship, demand that the state and its ministerial officers should forbear to provoke the occasion for the federal judiciary to assert their jurisdiction to see that the federal constitution is recognized and obeyed. The most august thing in government is law, and the highest duty of citizenship is obedience to and respect for the law. My opinion is that sufficient appears to entitle the petitioner to the temporary writ of injunction.

FOSTER, J., concurs.