FARMERS' NAT. BANK OF HUDSON v. JONES, Governor of Arkansas, et al.

(Circuit Court, E. D. Arkansas. December 29, 1900.)

1. JURISDICTION OF FEDERAL COURTS—SUIT AGAINST STATE.

A suit against the officers of a state to compel them to do acts which would impose a contractual pecuniary liability upon the state, or to issue any evidence of debt which would have that result, is, in fact and legal effect, a suit against the state, of which a federal court has no jurisdiction.

2. EQUITY JURISDICTION—MANDATORY SUIT AGAINST PUBLIC OFFICERS.

A bill in equity to compel a board of public officers to issue bonds to plaintiff is, in effect, a petition for a peremptory mandamus, and neither can be maintained unless the act sought to be coerced is a purely ministerial one, enjoined on the defendants by positive requirement of law, which leaves nothing to their discretion.

3. STATES—POWER OF BOARD TO ISSUE BONDS—ARKANSAS STATUTE.

Act Ark. May 8, 1899, which authorizes and directs the state debt board to fund the valid bonded indebtedness of the state by exchanging new bonds for outstanding valid bonds, which shall be presented by the holders, confers no power on such board to issue new bonds in lieu of old bonds which have been lost or destroyed, even though they were erroneously destroyed by the officers of the state, nor can such power be conferred by a court on equitable grounds; the only remedy of the creditor being through legislation.

In Equity. Suit against the state debt board of Arkansas to compel the issuance of state funding bonds to complainant.

The act of the legislature of the state of Arkansas approved May 8, 1899, entitled, "An act to fund the debt of Arkansas and for other purposes," contains the following provisions:

"Section 1. That the state debt board is hereby authorized and directed to fund the valid bonded indebtedness of the state of Arkansas, excepting the one hundred and sixty (160) bonds of the series of 1870, now owned and held by the United States, and to call in the outstanding script and treasurer's certificates of this state."

"Sec. 3. Each bond at the time of its delivery or exchange shall be signed by the governor and sealed with the great seal of the state, be countersigned by the treasurer and registered by the auditor of state, and the date of each registration shall be endorsed on the bond and signed by the auditor. The signature required above shall be in the personal handwriting of the official making the same. The coupon attached to each bond may be signed by the treasurer alone, which signature may be engraved thereon at time of preparation of the blank bonds by the printer."

"Sec. 5. Immediately after the passage of this act the state debt board, by its president, shall publish for sixty days, in each, in a daily paper in Little

Rock and New York City, a notice to all private holders of valid bonds of this state, to present same for exchange for new bonds provided for by this act. The basis of exchange shall be an amount of new bonds equal to the aggregate amount of old bonds and matured coupons thereto attached."

On the 4th day of May, 1900, the plaintiff in this case presented to the state debt board its petition requesting the board to issue to it, under the act quoted, funding bonds in lieu of certain state bonds which it alleged belonged to it, and had by mistake been burned by the burning board of the state on December 11, 1896. The state debt board, upon consideration of the plaintiff's petition and the evidence presented in support thereof, made the following finding of facts:

"And upon consideration of the recitals thereof, and the matter and questions arising thereon, in connection with the evidence offered in support thereof, and an examination and inspection by the board of the records in the office of the auditor and treasurer relating thereto, the board reached the conclusions, and made and hereby declares the following finding of the facts, as the same exist and relate to the said matter, namely:

"(1) That the said Farmers' National Bank and its predecessor in interest, the Farmers' Bank of Hudson, New York, became the owner prior to June 14, 1839, of the following described non-Holford Real-Estate Bank bonds of the said state of Arkansas, issued under authority of the act of legislature of said state to aid in establishing what was known as the 'Real-Estate Bank', together with coupons thereto, the numbers of said bonds being Nos. 482, 487, 488, 489, 490, 491, 492, 493, 494, 495, 496, 497, 498, 499, 657, 658, 676, and 698, being eighteen bonds; that said bank remained continuously the owner of said bonds until September 12, 1871.

"(2) That on the 12th day of September, 1871, the officers of said bank caused the said described bonds and coupons and others owned by it to be surrendered to the financial agent of the state of Arkansas, at the office of the Union Trust Company in the city of New York, to be exchanged for new funding bonds under the provisions of the act of April 6, 1869, which authorized and directed such exchange.

"(3) That in exchange for said Real-Estate Bank bonds and others, and by way of funding same in manner provided for in said act of 1869, said funding agents of the state of Arkansas wrongfully caused to be delivered to said Farmers' National Bank, either fraudulently or through mistake, the following described pretended bonds of said state, namely, Nos. 1,451 to 1,480, both inclusive, 1,496 to 1,508, both inclusive, 1,511, 1,512, 1,753, 1,794, 1,795, 1,809, and 1,810, being fifty bonds, and equivalent in amount of the aggregate sum of bonds and coupons so surrendered by said band for exchange.

"(4) That the said fifty bonds were of the date and denomination of bonds issued by said funding agents to F. W. Caper, as attorney for Holford, on the 22d day of September, 1869, and the delivery thereof in exchange for the non-Holford bonds described in finding No. 1, on the 12th day of September, 1871, was either a mistake or a fraud upon the rights of the Farmers' National Bank.

"(5) That there appears upon the record of detailed receipts kept by said funding agents an entry purporting to have been made on January 31, 1872, reciting the fact that on said date the bonds described in finding No. 1 were presented by one W. P. Denkla for funding into new bonds under said act of 1869, and on said day the said funding agent awarded in exchange for said bonds the following described funding bonds of the series of 1869, and of these Nos. 796, 797, 798, 799, 800, 801, 802, 803, 804, 805, 806, 807, 808, 809, 810, 811, 812, 813, 814, 815, 816, 817, 818, 819, 820, 821, 822, 823, 824, twenty-nine bonds, each of said bonds bearing interest at the rate of 6 per cent. per annum, and having coupons attached for same from January 1, 1872; that, notwithstanding the said twenty-nine bonds were so ordered to be issued in exchange for the said twelve non-Holford bonds and the coupons thereon, only four thereof, namely, Nos. 796, 805, 823, 824, were in fact issued, and the same have been duly redeemed and paid, and that, therefore, no claims, legal or equitable, exist against the state of Arkansas for said four bonds.

"(6) That the remaining twenty-five bonds, and all coupons aforesaid thereto

attached, although duly prepared and signed and registered, were never in fact delivered to said W. P. Denkla, or to any one else, but apparently remained continuously in the hands of the funding agents until 1896, when the same were taken into possession of the treasurer of Arkansas, and on the 11th day of December, 1896, listed, and destroyed by burning, by the tribunal known as the 'Burning Board of the State of Arkansas,' and that at the same time, and under the same circumstances, the said twelve original non-Holford Real-Estate Bank bonds surrendered by the said Farmers' National Bank for funding and exchange as aforesaid were received from said funding agent by said treasurer and likewise burned."

"(8) That the said twenty-five bonds so coming into the possession of said state treasurer, and destroyed as aforesaid, were not the property, legal or equitable, of the said W. P. Denkla or the state of Arkansas, but belonged in fact to the Farmers' National Bank.

"(9) That said Farmers' National Bank has offered to surrender to this board the Holford bonds described in finding No. 3, disclaiming any right thereto.

"(10) That this board, notwithstanding it concedes to the said Farmers' Bank the ownership of the claim and debt represented by the twenty-five (25) funding bonds and coupons destroyed on December 11, 1896, declines to issue and deliver to said bank in exchange therefor the bonds of the state of Arkansas under the funding act of 1899, for the reason that in the judgment of the board the authority conferred by said act limits its powers to the funding and exchange of bonds and coupons in existence and capable of an actual manual delivery and exchange, and does not extend to or include claims based on bonds and coupons destroyed, even if the same was done erroneously.

"Because of the ground stated in this paragraph, the board now declines to fund the claim of the said Farmers' National Bank.

> "Dan W. Jones, Governor.
> "Alex C. Hull, Secretary of State.
> "Clay Sloan, Auditor of State.
> "Thos. E. Little, Treasurer of State."

Upon the refusal of the state debt board to issue refunding bonds to the plaintiff for the bonds so burned, this bill in equity was filed, setting out, at length and in detail, the facts found by the state debt board, and concluding with these prayers: "Wherefore the said complainant prays that the said official defendants may be held to be estopped to insist upon an actual tangible presentation of the bonds and coupons belonging to the defendant, in the face of the admitted fact that the same were destroyed by the officers of the state when there was no claim that the same belonged to the said state of Arkansas, but the record showed that they belonged to the owners of the bonds that they were directed to be exchanged for. (2) But, if complainant shall be mistaken as to its right to relief of this character under the facts stated, it prays that, under the language of the statute authorizing and directing the defendants composing the state debt board to fund the valid bonded indebtedness of the state, be held to include the power to fund as such bonded indebtedness the destroyed bonds and coupons of this complainant burned by the officers of said state, treating the said bonds and coupons as still in existence, in furtherance of justice and to accomplish the plain equities of this complaint, and to prevent the officers of the state from taking advantage of their unauthorized act in burning bonds and coupons which did not belong to the state at the time of the destruction thereof, it being a fact that the funding board could not lawfully destroy the property of any person under its powers. (3) If complainant should be mistaken as to its rights to relief in either aspect stated, then it prays that the said defendants re-execute the said bonds and coupons so destroyed, and when so re-executed, or treated as so re-executed, that the said defendants composing the said state debt board proceed to make exchange therefor, in accordance with the act of 1899, as valid bonded indebtedness of the state, and to issue and deliver to it new bonds for the aggregate amount of its said twenty-five bonds and the coupons thereon, and which would mature on the date of the court's order, the said new bonds to be for the amount, and numbered, signed, and registered, as required by the act of 1899, to make and constitute the same valid bonded obligations of the state

under said act. (4) That process issue for each of said defendants, commanding each thereof to make answer to the same under the penalty, etc., and that pending a hearing that the defendant Little, as treasurer, be enjoined from listing for destruction, and the said board from destroying, so many of the blank bonds now in the hands of said Little, as treasurer, as may be required to comply with any order that may be made in this cause. (5) That defendants make answer unto this bill, but not under oath, the same being hereby expressly waived. (6) That complainant be granted all other and further relief that the foregoing facts may entitle it to and to equity may appertain."

The state, by her attorney general, appeared, and demurred to the jurisdiction of the court upon the ground that the suit was, in fact and legal effect, one against the state. This demurrer was overruled by the district judge; and thereupon the state, by her attorney general, protesting and denying the jurisdiction of the court, filed an answer denying the material allegations of the petition. The facts as found by the state debt board are clearly and indubitably established by the evidence in the case.

.James P. Clark and Thomas C. McRea, for complainant.
Jeff Davis, Atty. Gen., and Chas. Jacobson, for defendants.

CALDWELL, Circuit Judge, after stating the case as above, delivered the opinion of the court.

A state, without its consent, cannot be sued by an individual. "It is a well-established principle of jurisprudence in all civilized nations that the sovereign cannot be sued in its own courts or any other without its consent and permission; but it may, if it thinks proper, waive this privilege, and permit itself to be made a defendant in a suit by individuals or by another state." Beers v. Arkansas, 20 How. 527, 15 L. Ed. 991. The United States has waived this privilege in this regard, and allowed suits to be brought against it in a few specified cases. Some of the states of the Union, including Arkansas, have at times claimed no immunity from suit, but made provision for submitting themselves to the jurisdiction of courts at the suit of any one who choose to sue them. Experience, however, soon demonstrated this to be an unwise and extremely injurious policy, and most, if not all, of the states, including Arkansas, after a brief experience, abandoned it, and refused to submit themselves to the coercive process of judicial tribunals. When the supreme court of the United States in Chisholm v. Georgia, 2 Dall. 419, 1 L. Ed. 440, decided that under the constitution that court had original jurisdiction of a suit by a citizen of one state against another state, the eleventh amendment of the constitution was straightway adopted, taking away this jurisdiction. That amendment reads as follows:

"The judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state."

Since the adoption of this amendment, the contract of a state is substantially without sanction, except that which arises out of the honor and good faith of the state itself, and these are not subject to coercion. Ex parte Ayers, 123 U. S. 443, 505, 8 Sup. Ct. 164, 31 L. Ed. 216. One claiming to be a creditor of a state is remitted to the justice of its legislature. It was once said by the supreme court of the United States that the eleventh amendment was limited to suits in which the state was a party to the record. Osborn v. Bank, 9 Wheat.

738, 6 L. Ed. 204. But as a state can perform its functions through officers and agents only, it was soon perceived that, if these officers and agents of the state were liable to be sued and coerced to comply with the judgments and decrees of a federal court, the whole scope and purpose of the amendment would be nullified, and the doctrine of that case on this point has long ceased to be authority.

It is now settled that the jurisdiction in such cases is dependent upon the real, and not upon the nominal, parties to the suit, and it is now clear, both upon principle and authority, that a suit against the officers of a state to compel them to do acts which would impose a contractual pecuniary liability upon the state, or to issue any evidence of debt, in the name of the state, which would have that result, is in fact and legal effect a suit against the state, though the state itself is not named a party on the record. This suit is not against the named defendants as individuals, but against them in their official character and capacity as officers of the state constituting the state debt board, and seeks to compel them to perform an official act in the name of the state, whereby the state will become bound for the payment of money by an evidence of debt which now has no existence, and which they are not by law empowered to issue. The state debt board owes to the state the duty to do for and in the name of the state the things enjoined upon it by the act of the legislature, and none other. The board, as a board, has no contract relations with the owners of lost or destroyed bonds, and stands in no relation to them which imposes on the board any duty towards them whatever; and if it be conceded that the state owes to the owners of lost or destroyed bonds, no matter by whose agency lost or destroyed, the duty of issuing new bonds in their stead, no federal court can coerce the state, or any of its officers or boards, by any form of suit or proceedings, to the performance of that duty. As was said by the supreme court in the Jumel Case, 107 U. S. 711, 2 Sup. Ct. 128, 27 L. Ed. 448, the board can be moved through the state, but not the state through the board. A suit like the one at bar, which seeks to compel a board of state officers to execute and deliver to a suitor the bonds of the state, which, if legally executed and delivered, would constitute a valid money obligation against the state, is to all intents and purposes a suit against the state, of which a federal court has no jurisdiction. It is a suit to compel the board to issue negotiable bonds of the state, to become legal and binding obligations upon the state. There is no difference between such a suit and a suit against the state for the amount of money expressed in the bonds. If one can be maintained, the other can. The justice and merits of the demand cut no figure in determining the jurisdiction of the court. When it is determined that the suit is one against the state, the jurisdiction of the court is terminated, and any inquiry into the merits of the case is irrelevant. There is a well-defined line of distinction between a suit like the one at bar and suits against officers and agents of the state to restrain them from inflicting a personal injury on a citizen in violation of his legal and constitutional rights, or to compel them to perform for a citizen a plain ministerial duty, the performance of which is enjoined upon them by law, and concerning the performance of which they have no

discretion. This line of distinction is pointed out and illustrated in the cases which we cite. Ex parte Ayers, 123 U. S. 443, 8 Sup. Ct. 164, 31 L. Ed. 216; Louisiana v. Jumel, 107 U. S. 711, 2 Sup. Ct. 128, 27 L. Ed. 448; Antoni v. Greenhow, 107 U. S. 769, 2 Sup. Ct. 91, 27 L. Ed. 468; Cunningham v. Railroad Co., 109 U. S. 446, 3 Sup. Ct. 292, 27 L. Ed. 992; Hagood v. Southern, 117 U. S. 52, 6 Sup. Ct. 608, 29 L. Ed. 805; Osborn v. Bank, 9 Wheat. 738, 6 L. Ed. 204; Davis v. Gray, 16 Wall. 203, 21 L. Ed. 447; Board v. McComb, 93 U. S. 531, 23 L. Ed. 623; Hans v. Louisiana, 134 U. S. 1, 10 Sup. Ct. 504, 33 L. Ed. 842; Pennoyer v. McConnaughy, 140 U. S. 1, 11 Sup. Ct. 699, 35 L. Ed. 363.

The plaintiff's suit must fail on another ground. The bill is, in effect, a petition for a peremptory mandamus on the state debt board to compel it to issue state refunding bonds to the plaintiff in lieu of state bonds alleged to have been wrongfully or erroneously burned by the state burning board, and which it is alleged belonged to the plaintiff. The act of the legislature, providing for refunding the bonded debt of the state, confers on the board no authority to issue refunding bonds in such a case. That act contemplates the exchange of one bond for another. Wherever the holder of a valid state bond presents the same to the board to be funded, it is the duty of the board to issue and deliver to the holder so presenting such bond a refunding bond for a like amount, as prescribed by the act. Until a valid state bond is presented to the board to be refunded, it has no jurisdiction to act in the premises. The actual presentation of a state bond to be refunded is an indispensable prerequisite to the exercise of its jurisdiction. It has no power or authority under the act to inquire into the ownership or validity of alleged lost or destroyed bonds with a view of refunding them. And the inquiry the board made, and the facts it found, on the application made to it in this case, were extra official. It was a judicious and proper thing to do, but after doing it the board rightfully decided that it was without power or authority to grant the relief sought, or give any legal force or efficacy to its findings. The court is fully in accord with the board in its finding of facts, but they have no official sanction or force. No state of facts can confer on the board the authority to issue state bonds. This can be done by law only. It is a power not to be implied or presumed; it must be expressly conferred. The facts found by the board will doubtless be persuasive before the tribunal which alone can do justice in the premises under the existing laws of the state. They are unavailing elsewhere. In the absence of express statutory authority, no state officer or board has power or authority to issue state bonds or other evidences or debt in lieu of bonds or evidences of debt alleged to have been lost or destroyed. The policy pursued by the United States in this regard is instructive. For a long time it was the practice to pass special acts of congress authorizing the secretary of the treasury of the United States to issue, upon the conditions prescribed in the acts, duplicate United States bonds in lieu of bonds destroyed by fire or otherwise. As examples of such acts we cite: Act Feb. 13, 1862 (12 Stat. 901); Act Jan. 19, 1861 (12 Stat. 878); Act March 28, 1864 (13 Stat. 577); Act

July 23, 1866 (14 Stat. 599); Act April 25, 1866 (14 Stat. 584); Act March 1, 1869 (15 Stat. 464). Finally, congress passed a general law on the subject to cover all cases of the loss or destruction of United States bonds, which is embodied in sections 3702–3705, Rev. St. U. S. Without express authority to that effect conferred by an act of congress, the secretary of the treasury of the United States never presumed to issue duplicate United States bonds to take the place of bonds lost or destroyed, no matter how clear or satisfactory the proof of loss might be. On examination, it will be found that the acts of congress and of the states, which authorize the issue of bonds or other evidence of debt of the United States or of a state in lieu of lost bonds or other evidence of debt, uniformly prescribe the conditions upon which it will be done. Proof of loss and the execution of an indemnifying bond are among the conditions required by such acts.

As before remarked, the bill in this case is, in effect, a petition for a peremptory mandamus. If a mandamus would not lie to coerce the state debt board to the performance of the act, no more can its performance be coerced on a bill in equity. A court of equity cannot, by its process or decree, invest a public officer with power or authority not conferred on him by law, any more than a court of law can do that thing by a writ of mandamus. When it is sought to compel a public officer or board to do a particular act, it must clearly appear that the law has made it the legal duty of the officer or board to do the act, and that the act is purely a ministerial one, which leaves nothing to the discretion of the officer or board. The whole law on this subject is briefly and accurately expressed by the supreme court of the United States in the case of U. S. v. Lamont, 155 U. S. 303, 15 Sup. Ct. 97, 39 L. Ed. 160. In that case the court say:

"The duty to be enforced by mandamus must not only be merely ministerial, but it must be a duty which exists at the time when the application for the mandamus is made. Thus, in the case of Ex parte Rowland, 104 U. S. 604, 26 L. Ed. 861, this court, speaking through Mr. Chief Justice Waite, said: 'It is settled that more cannot be required of a public officer by mandamus than the law has made it his duty to do. The object of the writ is to enforce the performance of an existing duty, not to create a new one.' Moreover, the obligation must be both peremptory and plainly defined. The law must not only authorize the act (Com. v. Boutwell, 13 Wall. 526, 20 L. Ed. 631), but it must require the act to be done. 'A mandamus will not lie against the secretary of the treasury, unless the laws require him to do what he is asked in the petition to be made to do' (Reeside v. Walker, 11 How. 272, 13 L. Ed. 693. See, also, Secretary v. McGarrahan, 9 Wall. 298, 19 L. Ed. 579); and the duty must be 'clear and indisputable' (Commissioners v. Aspinwall, 24 How. 376, 16 L. Ed. 735)."

And see Board v. King, 14 C. C. A. 421, 67 Fed. 202. These rules are applicable to this case, and decisive of it. The bill must be dismissed for want of jurisdiction, without prejudice to the plaintiff's right to assert its claim before any tribunal competent to afford the relief sought.